UNITED STATES, Appellee

v

CLAUDE J. BATCHELOR, Corporal, U. S. Army, Appellant

7 USCMA 354, 22 CMR 144

355

356

358

No. 7611

Decided Sept. 7, 1956

*Joel W. Westbrook,* Esq., and *Captain Albert C. Malone, Jr.,* argued the cause for Appellant, Accused.

*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Howard S. Marcu.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused, an American infantryman who left the shores of this country to fight on foreign soil, was captured by the Chinese Communists on November 2, 1950, while serving in combat in Korea. He remained in their hands as a prisoner of war until September 25, 1953, which was after the general exchange of prisoners, when he was turned over to the Indian Custodial Forces in the neutral zone near Kaesong, Korea. On January 2, 1954, he elected to return to American control. His trial by general court-martial—which lasted some five weeks and resulted in a record which may be described as voluminous—amounted to a searching examination into the things that he did as a prisoner at Camp 5, Pyoktong, North Korea, and the many reasons why he did them.

The trial resulted in accused's conviction of two offenses of communication with the enemy without proper authority, in violation of Article 104(2), Uniform Code of Military Justice, 50 USC § 698; uttering a letter which was disloyal to this Nation, intending there-by to promote disloyalty and disaffection among United States civilians, in violation of Article 134 of the Code, 50 USC § 728; misconduct as a prisoner of war by informing on a fellow-prisoner, in violation of Article 105 of the Code, 50 USC § 699; and wrongfully participating in the trial of a fellow-prisoner to the extent of recommending that he be executed, again in violation of Article 134, supra. He was sentenced to dishonorable discharge, total forfeitures, and confinement for life. Intermediate appellate agencies have affirmed, but the convening authority reduced the term of confinement to twenty years. We granted review on four issues, none of which call in question the sufficiency of the evidence, and these will be stated seriatim, as considered. However, we pause to observe that the evidence supporting the findings of guilt is overwhelming, and we will not recite it in detail. Those who are interested in an extended statement of the facts should examine the board of review's decision, reported as United States v Batchelor, 19 CMR 452. For the purposes of clarity, we have

**359**

arranged the evidence as it relates to each specification, and the specifications themselves have been treated in chronological order.

## II

*Specification 2, Charge I, unauthorized communication with the enemy.*

Under this specification, the prosecution set out to prove that the accused, while incarcerated at Camp 5, from July 1951 until September 1953, improperly communicated and consorted with the enemy as a mode of daily living. That is, he embarked on a course of conduct which was inimical to the best interests of the United States, which continued over a long period of time and which was forbidden by law. It was shown that the accused was a leader of voluntary "study groups" conducted under Communist auspices; that he repeatedly expressed the view that the United Nations forces were the aggressor in Korea; that he often stated the United States was guilty of "germ warfare" in Korea; that he argued America had initiated the Korean war only to avert a depression in this country; that he asserted American soldiers were being used as the tool of American warmongers and Wall Street profiteers; and that he contended the United States was not sincere in its truce negotiations with the Communists. The accused also made daily broadcasts over the camp public address system during a certain period in which he advanced similar assertions and many others, including the claim that the United States was guilty of despicable treatment of the prisoners of war which it held. He was chairman of the Camp 5 "peace committee," prepared and circulated "peace petitions," and was instrumental in coercing other prisoners to sign the petitions. The accused introduced a certain American lieutenant to his company when that individual came to Camp 5 to make speeches, wherein the officer admitted dropping "germ bombs" while serving as a United States Air Force officer, and Batchelor followed up the speech by proclaiming he would be one of the first to condemn the American Government for ordering such barbarous warfare.

As a result of all this, the accused became a favored prisoner in that he was permitted to come and go almost as he pleased in the camp and at camp headquarters, intermittently lived at headquarters for substantial periods of time, had better food to eat, and received Chinese currency to spend rather than being issued rations. He adhered to the Communists' propaganda "line" so faithfully that he was looked upon by them as an outstanding "peace fighter" and praised as a "young Lenin."

The accused did not dispute the Government's proof of the acts alleged in this specification or any of the others under Charges I and II. However, he did attempt to show that all of his efforts were dedicated to ameliorating the harsh lot of his fellow-prisoners and to furthering the cause of "world peace"—as the Communists understand that term—and that he honestly believed he either had or did not need authorization to carry out those aims. Furthermore, it was his position that his erroneous beliefs came about because he was suffering at the time from a mental psychosis induced by Communist pressures and propaganda. As a result, the record contains a great deal of conflicting testimony from expert medical witnesses presented by the adversaries. Because that issue was common to all of the original charges, though not to the Additional Charges, it will be mentioned briefly later on in the opinion.

*Specification, Additional Charge I, giving information to his captors concerning a fellow-prisoner of war to the detriment of that prisoner.*

Sometime in March or April 1951, Private John Megyesi, a prisoner of war at Camp 5, came into possession of a camera and some film, which he used secretly to take pictures of atrocities committed by his captors. Having exhausted his supply of film by June 1951, he gave the camera to one Buckley, who turned it over to Lieutenant Walter L. Mayo. Mayo had obtained a roll of suitable film and, like Megyesi, used the combination to record many of the injustices he saw perpetrated. Toward the end of July 1951, the Communists

came to know that someone at the camp had a camera and directed the accused and a British prisoner of war, who was a fellow "progressive," to ascertain its whereabouts. Several days later, the accused was overheard informing his captors that Private Megyesi had the camera. Megyesi was then interrogated concerning the photographic equipment and placed in confinement for over two months. The Communists also tracked down Mayo and placed him in solitary confinement.

The accused denied he had been guilty of informing concerning Private Megyesi, and other evidence was presented on his behalf which tended to cast doubt on the recollection of Sergeant Buli, who testified he had overheard the accused's conversations with his captors concerning this incident, but that issue does not now concern us, for the court chose to believe the prosecution witnesses.

*Specification, Charge II, uttering a disloyal letter with intent to cause disaffection among the civilian populace of the United States.*

On October 15, 1952, the accused wrote a letter to the editor of his home town newspaper in Kermit, Texas, and asked that the letter be published, either free of charge or at his father's expense. In that letter he asserted that the United States had been guilty of bacteriological warfare in Korea; that this had been authorized by highly placed officials in this country; and that he had personally seen much evidence of this practice. The accused then called upon whoever might read the letter to "Demand Peace Now And Stop this Cruel Inhuman Act Before it is Too Late!!" Although the accused testified he had not intended to promote disloyalty or disaffection among this Nation's civilian populace by writing this letter and seeking publication of his views, he conceded he had intended to create ill will toward the people responsible for the assumed germ warfare, and that if the President had been the person responsible, he intended to create a degree of hostility toward the Chief Executive.

*Specification 1, Charge I, unauthorized communication with the enemy.*

Early in June 1953, as the accused put it in one of his pretrial statements, "the Chinese thought up an idea of sending secret agents into the United States for Communist work. This was to be a super secret organization, and I was called in to consult with the Chinese on how this organization should be operated." The organization itself was not to be secret, and any former prisoner of war was to be eligible for membership. However, the accused, who was to be its leader, and the other members selected to form its guiding nucleus, were not to be revealed to the public or the general membership as such. Ostensibly the purpose of the organization would be to help former prisoners of war in cases of sickness or financial distress, and to improve their lot through other benefit plans, but ultimately it was to further the Communist Cause. Accused explained its eventual objective in this language: "[E]ventually we could set [up?] a peace platform through our propaganda sheet and gradually turn it in to a revolutionary organization." When operational, the organization was to be linked secretly to the Communist Party of the United States through the accused.

*Specification, Additional Charge II, wrongful participation in the trial of a fellow-prisoner.*

Wilburn C. Watson, then a private first class in the American forces, was taken prisoner by the Chinese Communists on April 21, 1951. For a variety of reasons—most of which were unsound—his captors regarded him as some sort of a spy and "trouble-maker," blaming him for inciting demonstrations against the Communists and disrupting such activities as study groups. As a result, Watson was several times beaten and threatened, kept in solitary confinement for over six months, and then placed in a hard labor camp. Early in July 1953, Watson was told by his captors that they were never going to release him and he was forced to sign a request for non-repatriation. A few weeks later, Watson was transferred to Camp 5,

**361**

where all the prisoners of war who had refused repatriation were assembled.

In August 1953, Watson was placed in jail overnight and then taken under guard to an old school building of some sort. He entered to find all of the non-repatriates and about five Chinese seated around several tables arranged horseshoe fashion. The Chinese commander then announced to those assembled that they were there to decide the fate of Watson, who was accused of being a spy and a "running dog for the American imperialists." He requested their opinion in the matter, and the non-repatriates began voicing, one by one, their views concerning the disposition to be made of Watson. The accused, who was the fourth or fifth to speak, recommended that Watson be shot as a detriment to the group, for his knowledge of the doings of the non-repatriates might be valuable to the Army if he was permitted to return to American control. Needless to say, Watson was terrified by that time, but eventually it was decided by the commander to permit him to be repatriated, and this was done.

In opposition to this charge, the accused tried to show that actually he had spoken in favor of Watson's repatriation at the time of the "trial," and that the entire episode was not really a trial, for the Chinese Communists had determined the outcome prior to the solicitation of opinions from the non-repatriates. In rebuttal, the prosecution presented Private Edward S. Dickenson, whose telling testimony against accused sounded the death knell for his hopes to escape a finding of guilty on this specification.

### III

Having given a short resumé of the facts, we pass on to consider the legal issues. On August 30, 1954, the first day of trial, the members of the court-martial were asked, during the usual procedures prior to arraignment, whether any of them were aware of any facts which might constitute grounds for challenge against them. Lieutenant Edward R. Schowalter, a member of the court and holder of this Nation's most treasured military honor, replied as follows: "Sir, I challenge myself on the grounds that I am hostile to the accused and that prior to the convening of this court I formulated the opinion and expressed the opinion that the accused is a traitor." The law officer summarily excused the Lieutenant and instructed the court to "completely disregard the comment made by the member excused." In addition, trial counsel asked the remaining members of the court-martial whether they could well and truly try the issues without bias or prejudice in view of the Lieutenant's comment. No negative reply was received, defense counsel proceeded to conduct voir dire, and he did not touch upon this subject. The following trial day, defense counsel moved for a mistrial on the ground that Lieutenant Schowalter's comment was so inherently prejudicial that the accused's right to a fair trial was substantially endangered, despite the warning given by the law officer. In support of the motion, defense counsel asked that Lieutenant Schowalter be called as a witness in order to determine how he had formed his opinion, whether he had discussed it with court members or other persons, and whether he had sought to be relieved from the court after his appointment and prior to its convening. The law officer ruled that the Lieutenant could be called for the limited purpose of determining whether or not he had discussed his views with other court members. Defense counsel declined to call the witness for that restricted issue, and the motion for mistrial was then overruled. It is now asserted by defense counsel that the law officer erred, both in denying the motion and in imposing restrictions on the areas as to which Lieutenant Schowalter could be examined. With this contention we do not agree.

It is true enough that a motion for a mistrial is an appropriate remedy whenever it becomes apparent that some incident has occurred during the course of a trial which affects the right of an accused to have a fair trial by the members then sitting. United States v Smith, 6 USCMA 521, 20 CMR 237. And there may be in-

362

stances where a disqualified member expresses an opinion which is so prejudicial to an accused that relief of the member from the panel will not serve to cure the prejudice, even though appropriate instructions are given by the law officer. United States v Richard, 7 USCMA 46, 21 CMR 172. However, the effect, if any, caused by remarks such as the one made by Lieutenant Schowalter may normally be cured by the procedure adopted by the law officer here, and the general rule is the appropriate one in this case.

In State v Weidlich, 269 SW2d 69 (Mo 1954), one of the members of the jury panel, on voir dire, observed that he didn't think that he could give a thief a fair trial. The trial court promptly excused the juror and admonished the remaining members of the panel, for the accused was on trial for burglary and larceny. In the face of a contention that counsel's motion for a mistrial should have been granted, the Supreme Court of Missouri replied:

". . . Normally, the disqualification of an individual juror for bias or the expression of an opinion is not a sufficient ground for a challenge of the entire panel, . . . [authorities cited], and, while the ill-considered remark may have disqualified the individual juror, the personal misconduct was not so evidently inflammatory and prejudicial that it may be said that the appellant's right to a fair trial has been infringed or that the trial court abused its discretion in refusing to quash the entire panel and declare a mistrial . . . [citing authorities]."

Other cases are to the same effect. In State v Perry, 149 La 1065, 90 So 406 (1921), a member of the jury panel stated during the course of his examination that "he had never heard it disputed that accused was guilty," and again, "that he had never heard any one deny that defendant was guilty." It was held that no abuse of discretion occurred when the trial court excused only that particular juror and did not discharge the entire panel. Similarly, in McGuire v State, 239 Ala 315, 194 So 815 (1940), one of the prospective jurors, during voir dire, asked to be excused, stating that he thought defendant was guilty of first degree murder as charged. The trial judge carefully ascertained that the remaining panel members had not been influenced by the remark and denied defendant's motion for a mistrial. The ruling was upheld as a proper exercise of the trial court's discretion.

Comparison of this case with United States v Richard, supra, easily demonstrates why this law officer did not err in denying the motion for mistrial. In that case, the disqualified court-martial member did more than merely express his opinion. He asserted that the accused had been tried for another serious offense, which was related to the one then before the court-martial, and attempted to buttress his opinion as to the offense for which the accused was then on trial by referring to certain inadmissible evidentiary items. Under those circumstances, we held prejudicial and inadmissible evidence tending to create hostility toward the accused was called to the attention of the court, and that the law officer had no choice but to declare a mistrial, for we believed that no reasonable person could fail to be influenced by the comments of the disqualified member. Here, however, the situation is quite different. No evidence had been introduced, and Lieutenant Schowalter expressed his opinion and nothing more. His reference to treason was untimely, but the accused was on trial for an offense which is strikingly similar to that crime. The Lieutenant did not embellish his remarks with reference to evidentiary matters which would "prove" the soundness of his opinion. Nor can it be said that the fact that he holds the Congressional Medal of Honor rendered his remarks any more offensive than they would have been had they been made by a person of less valor. Indeed, it is likely that a person who had himself demonstrated such a high degree of bravery in combat would be likely to hold others to a higher standard than that which would be demanded by the remaining members of the court-martial. Accordingly, we cannot say that the law officer abused.

his discretion in failing to grant a mistrial.

We are equally sure that defense counsel must fail as to the second prong of his argument under this ■ assignment of error. Although he asserts he was unduly restricted as to his proposed examination of Lieutenant Schowalter, we cannot share his view. We believe the law officer exercised his discretion properly when he ruled that the examination of Lieutenant Schowalter must be confined to the question of whether he had communicated his opinions to any of the remaining members of the court-martial. Any other areas of examination might be of some interest as general information but would have no relevancy to an issue concerning the qualifications of the other officers ordered to serve on the court. The question as to whether they were influenced by his remarks, had heard of his opinions from other sources, or already they shared them, could best be answered by questioning the remaining members themselves. We, therefore, conclude that the law officer's ruling was correct.

## IV

On December 23, 1953, Major Edward Moorer, a member of the United Nations Explainer Group, which was charged with the mission of attempting to persuade the accused and others like him to accept repatriation, made the following broadcast to the non-repatriates over a public address system:

"Attention all prisoners of war in the compound! Attention!

"I am Maj. Edward Moorer of the United Nations Command explainer group. This is the final day of the 90-day explanation period provided as a condition of the armistice in the Terms of Reference. Repeatedly, through the Neutral Nations Repatriation Commission, we have offered you the opportunity to exercise your right to attend an explanation. You have not availed yourselves of this opportunity and right which expires today.

"We believe that there are some among you who desire to be repatriated—who want to return home, but who are being forcibly prevented from expressing your free will by fear, threats and strong-arm methods of certain of your fellow prisoners. It is clear that your so-called representatives are withholding information and restricting your freedom to speak and act as individuals.

"Do not be afraid. Seven Koreans and one American have returned to freedom from your compound. They report that they risked their lives in order to escape. You can obtain your freedom without danger if you take advantage of the safe situation which exists here at this time.

"We have taken this means to insure that your rights as individuals can be exercised. The Indian guards are present to assure your safety. We are personally here to receive any of you who desire to return home. Cpl. Edward Dickenson returned home to his loved ones and enjoyed a combination 30-day leave and honeymoon. This fact explodes Communist charges that you and your family will be harmed if you return. I assure you nothing shall happen to your family at the hands of the United States Government regardless of your decision—whether to remain or to return to the United States.

"If there are any of you who have been fearful of expressing your desires to return to the United States, now is the time. Come forward and inform the guard nearest you. The Indian guards will protect you, you have nothing to fear. The guards will protect you. In a matter of hours you will be on your way home.

"We shall wait here with the Indian guards for half an hour for those of you who may desire to come forward. You need not fear for your safety. If you really want to come home now is the chance for which you have been waiting.

"The 90-day explanation expires tonight, 23 December at midnight.

"The fact that you have not elect-

364

ed repatriation prior to this time will not be held against you.

"With the protection afforded you by the Indian guards you are free to make your choice."

As mentioned earlier, the accused returned to American control on January 2, 1954. Defense counsel, in essence, now contend that Major Moorer must be deemed to have been an authorized agent speaking for the President when he made the aforementioned broadcast, that the message itself amounted to an offer of a general amnesty or pardon on behalf of the Executive, and that the accused accepted this offer when he returned.

Amnesty has been defined as an act of the sovereign power granting oblivion or a general pardon for a past offense, and is rarely exercised in favor of single individuals, but is usually exercised in behalf of certain classes of persons who are subject to trial but have not yet been convicted. Curtin v United States, 236 US 96, 35 S Ct 271, 59 L ed 482 (1915); Burdick v United States, 236 US 79, 35 S Ct 267, 59 L ed 476 (1915); 39 Am Jur, Pardon, Reprieve and Amnesty, § 6. So far as the Federal system is concerned, the Constitution of the United States grants a general pardon power to the President and no one else, and it is clear enough that this pardon power includes the power of amnesty. U. S. Constitution, Article 2, § 2, Clause 1; Ex parte Garland, 4 Wall 333, 18 L ed 566 (1866).

It is the general rule that this pardon power is nondelegable and cannot be shared with another person or official when the power is granted in terms similar to those used in our Constitution. 67 CJS, Pardons, § 3b. Furthermore, the Manual for Courts-Martial, United States, 1951, paragraph 68e, speaks of the defense of pardon as being "an act of the President." Thus we have no reason to suppose that the power to grant an amnesty with respect to offenses against the laws of the United States can be delegated. Admittedly, Congress is not precluded from enacting amnesty statutes, Brown v Walker, 161 US 591, 16 S Ct 644, 40 L ed 819 (1896), but this exception is not at all pertinent here for it certainly has not acted. Thus, we are limited to the question of Presidential action, and there is nothing in this case to indicate that the communication itself was ever authorized by the Chief Executive of the United States or that he meant to offer an amnesty of any sort to the accused and those of his class. Indeed, the evidence is quite to the contrary. The text of this broadcast was formulated within the explainer group and based in large part on information which the group learned from Corporal Dickenson upon his return to American military control. Its draftsmen were not authorized, and did not intend, to offer any sort of amnesty or pardon with respect to offenses committed by prisoners of war prior to the general exchange of prisoners. Furthermore, Major Moorer was speaking in the name of the United Nations and not in the name of the United States when he made this broadcast. The broadcast itself was aimed at British and South Korean non-repatriates, as well as Americans. Therefore, it cannot be said that this broadcast was authorized by, or became an act of, the President.

If it is assumed for the purpose of argument that Major Moorer was speaking on behalf of the President of the United States, it still does not follow that the broadcast included a grant of amnesty. It is well settled that no technical words or terms are necessary to constitute a pardon or amnesty, but this instrument does not possess any of the requisite attributes. In 39 Am Jur, Pardon, Reprieve and Amnesty, § 46, we find the following concept expressed:

". . . Since pardons are in derogation of law, in order to be valid and of effect they must accurately describe the offense intended to be forgiven, but a pardon which specifies that it is for a particular offense is sufficient although it recites incorrectly the date of the offender's conviction [or offense], if it can be shown by extrinsic evidence that the

**365**

pardon was intended to apply to the offense specified."

When we apply that rule to this broadcast, we find nothing to indicate a grant of amnesty as to offenses committed prior to the general exchange of prisoners of war between Communist China and United Nations. This broadcast promised that the accused would not be tried for failing to elect repatriation at an earlier time, that he would be accorded safe conduct, and that his family would not be harmed. Beyond this it does not go, and given the most liberal interpretation possible, it does not, in law or in fact, amount to an offer of amnesty or condonation in any degree.

Finally, on this granted issue, it has been suggested by the Supreme Court that both amnesty and pardon may be accepted or rejected by the recipient and that neither can be forced upon any one. It would follow that until the individual to whom amnesty was offered accepts it, the amnesty would not be effective. Burdick v United States, supra. Although this requirement of acceptance in a pardon case may have been abandoned by the United States Supreme Court in a later case, Biddle v Perovich, 274 US 480, 486, 47 S Ct 664, 71 L ed 1161 (1927), it is evident that here we are confronted with a different situation. If we assume that forgiveness was offered in the broadcast, it was made contingent upon acceptance before midnight, December 23, 1953. To bring himself within the terms of the grant, accused had to act affirmatively before that time. He failed to do so, and by his failure he forfeited his right to claim the preferred benefit. Furthermore, he did not testify that he was motivated to return by the broadcast or that he understood it to offer him a general amnesty. Thus, by no possible stretch of the imagination could any doctrine of estoppel be invoked. We, therefore, conclude that this assignment of error must be determined adversely to the accused.

V

We come, then, to the third granted issue, which involves the correctness of the law officer's instructions with respect to Charge I, wherein the accused was charged, in two specifications, with carrying on unauthorized communications with the enemy. As we have earlier mentioned, the accused substantially admitted the facts involved in these specifications, but, to escape their criminal effect, he offered evidence to show that he sincerely believed his activities were authorized by similar acts of other prisoners who were commissioned officers. In addition, he contended he had not offended because he believed that he was acting in the best interests of his fellow-prisoners, world peace, and the people of the United States, and that he so believed because he was suffering from a mental psychosis at the time.

Faced with this situation and the facts which we earlier recited, the law officer instructed on the law of insanity and then launched into a discussion of the elements of these two offenses. He treated them separately in reciting their elements, but we will be content to summarize his instructions as a whole. He informed the court-martial members that a verdict of guilty could not be returned unless they were satisfied beyond a reasonable doubt that the accused, without proper authority, had knowingly participated with the Chinese Communists in planning a subversive organization, had knowingly conducted study groups, made speeches, drafted and circulated "peace" petitions, and expounded Communistic propaganda viewpoints, and that he knew at the time that the people he was collaborating with were enemies of the United States. The law officer then characterized these offenses as requiring a general criminal intent and instructed on honest belief as a defense. Next, the law officer defined such matters as "course of conduct" and then gave the following instruction on knowledge:

"Specifications 1 and 2 of Charge I allege 'knowingly communicated, corresponded and held intercourse with the enemy.' You are advised that by 'knowingly,' as used in Specification 1 and Specification 2 of Charge I is meant that accused knew

he was dealing with an enemy of the United States and that he had full knowledge of all the facts alleged in the specification after the word 'knowingly.' In this connection, in any finding of guilty you should except from Specification 1 and Specification 2 of Charge I any allegation which appears after the word 'knowingly' as to which you are not convinced that the accused was aware. For example, with regard to the evidence in this case that accused believed that he was acting in the best interests of the United States, you are advised that if you are convinced beyond a reasonable doubt that the accused communicated, corresponded and held intercourse with the enemy as to the organization alleged in Specification 1 of Charge I but you are not convinced that he knew that such organization was to be directed against the interests of the United States, you should except the words 'to be directed against the interests of the United States' from the specification in your findings.

"You have heard the expression 'ignorance of the law is no excuse.' Stated another way, accused is presumed to know the law, and in this case is chargeable with knowledge that unless properly authorized to do so he was prohibited from communicating, corresponding or holding intercourse with the enemy. One who corresponds with the enemy without an honest belief that he has authority to do so violates Article 104, provided, of course, all the elements of the offense as to which I have previously instructed you are present."

Defense counsel differed with the law officer concerning the propriety of the instruction on knowledge, and to bring his theory to the fore, he submitted two requested instructions. They were refused by the law officer, and rightly so. We quote them in full:

"You are instructed that the word 'knowingly' as used in Specifications 1 and 2 of Charge I, means that the acts were done with the full knowledge on the part of the defendant of all the essential elements of the offenses charged.

"An act is not knowingly committed within the meaning of that term as used in Charge I Specifications 1 and 2 unless the act is committed with a bad purpose, with full knowledge of all the facts involved, including knowledge that it is wrong, without justifiable excuse and without ground be [sic] believing it is lawful."

Counsel for the accused now contend that the law officer's instructions, as opposed by the ones submitted by them and quoted above, together with one given on a lesser included offense, were erroneous in three respects. They first assert that conviction under Article 104 of the Code, supra, requires proof of a mens rea, or criminal intent, and that the law officer's instructions permitted the court-martial to find the accused guilty in the absence of any such intent on accused's part. Next, it is said that the law officer failed to require a finding that the communications were unauthorized. Last, it is argued that by instructing on a lesser included offense as to specification 2, while not submitting any as to specification 1, the law officer impliedly told the fact finders that the accused should be found guilty of the first specification. We shall consider each point in turn.

We have no doubt that counsel are on sound ground when they assert that the Article under examination requires a showing of criminal intent, and the Government concedes that premise to be true. An Army board of review has so held with respect to Article 104(1), United States v Olson, 20 CMR 461, and surely an offense which is so closely akin to treason and may be punished by a death sentence cannot be viewed as a "public welfare" kind of dereliction. See United States v Doyle, 3 USCMA 585, 14 CMR 3. However, defense counsel reason that if intent is required, it must be a specific intent of some sort (to betray his country, for instance), and in this we hold they err.

Article 104 of the Uniform Code reads as follows:

"Any person who—

"(1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other thing; or

"(2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;

shall suffer death or such other punishment as a court-martial or military commission may direct."

This provision is not new or novel, for it was taken, with only minor changes, from Article of War 81, 10 USC § 1553. See Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 2498, Uniform Code of Military Justice, page 1229. Indeed, the present enactment bears a striking resemblance to Article 28, American Articles of War of 1775, which provided:

"Whosoever belonging to the continental army, shall be convicted of holding correspondence with, or giving intelligence to, the enemy, either directly or indirectly, shall suffer such punishment as by a general court-martial shall be ordered."

and the gist of this penal statute has appeared in every military code since that time. See Article 46, American Articles of War, 1874; Article 81, Articles of War of 1916 and 1920.

Probably the most respected early writer in the field of military law is Colonel William Winthrop, and in his learned treatise (Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, page 630, Footnote 78), he distinguished Article 46 of the American Articles of War of 1874, the predecessor statute, from treason, saying that the offense before us does not require the specific intent found in treason. "Thus correspondence with an enemy in regard to matters purely social or domestic, while lacking the *animus* of treason, would, unless duly authorized, constitute an offense under Article 46."

In United States v Dickenson, 6 USCMA 438, 20 CMR 154, we had occasion to give some consideration to Article 104 from another point of view,

and at that time we were unable to find any indication that Congress intended its language therein to be given any interpretation other than its natural and apparent meaning. We have no reason to reach any other conclusion here, and therefore hold that Article 104(2) of the Code does not require a specific criminal intent of any sort. It follows that the law officer's instructions, requiring as they did the finding of a general criminal intent and a finding as to words importing criminality, were correct.

We do not understand the case of Martin v Young, 134 F Supp 204 (ND Cal) (1955), to hold anything contrary to our present holding, but if it does we respectfully disagree. In that case, the accused Martin, formerly a member of the Army, was arrested pending trial by general court-martial for an offense laid under Article 104 of the Code and allegedly committed while Martin was a prisoner of war during the Korean conflict. The specification alleged the same sort of facts and unauthorized acts as those presently before us. While en route to a holding that the court-martial lacked jurisdiction over the petitioner, Judge Goodman observed that Martin could be tried in a civil court for treason, saying:

". . . Here the Army has charged petitioner with grossly disloyal conduct clearly proscribed by the criminal statutes noted [including treason]. If it were proven that petitioner knowingly pursued this course of conduct, an inference of criminal intent [to adhere to this Nation's enemies?] would be compelling in the absence of some defense such as coercion."

But what the judge did not say is that Article 104 requires a specific intent, or that it proscribes the offense of treason, or that the Government is prohibited from overproving its case in prosecutions under Article 104. Furthermore, whether this accused specifically intended to adhere to the Communists is not nearly so apparent to us as Martin's intent seems to have been to Judge Goodman in that case. Upon the evidence presented in this record,

the court-martial members might well have believed that the accused thought himself to be only a "peace fighter," and not an adherent to Communist China. That belief gave aid and comfort to our enemies, and served their propaganda purposes at least as well as outright adherence, but it is not easily raised to the level of the intent required to make out treason.

In closing the criminal intent branch of their argument, defense complain bitterly that, under the law officer's instructions, the court-martial members were entitled to convict if they were satisfied that the accused had voluntarily and knowingly communicated with the enemy without proper authority, even though the accused believed his acts contributed to world peace and the best interests of his fellow-prisoners and his country. This we regard as an accurate assessment of the law officer's instructions, but we disagree with defense counsel's conclusion, for we believe that the instruction is a good statement as to what the law is in this field.

It was the theory of the defense that the accused held two honest but mistaken beliefs during the relevant time period. First, it was contended that the accused honestly believed he was authorized to collaborate with his captors for the purpose of improving the lot of his fellow-prisoners, a contention we will deal with shortly. Next, it was urged that he collaborated with his enemies because he was suffering from a mental phychosis which caused him to believe, as a part of his delusional system, that the Chinese Communists were not enemies of the United States, and that he was aiding world peace and the people of the United States by his acts. We may brush aside the question of insanity, for that question was passed on by the court-martial under instructions which are not under attack here. The question then becomes one of whether what might be a laudable motive—in entirely different circumstances—will serve to exculpate a defendant charged with improper communication with the enemy.

In Chandler v United States, 171 F 2d 921 (CA 1st Cir) (1948), the accused, an American citizen, was charged with treason. It was argued that treason is a crime dependent upon the actor's motives, and that the jury should have been told that the defendant could not be found to have had an "intent to betray" if they believed that he acted from patriotic motives upon a firm conviction that what he did was for the best interests of the United States. The Circuit Court rejected this argument, and we believe its language is appropriate here. Chief Judge Magruder, the organ for the court, disposed of the matter as follows:

". . . if appellant's argument in this connection were sound, it would of course be applicable whatever might be the character of the overt acts of aid and comfort to the enemy. Suppose Chandler had obtained advance information of the Anglo-American plans for the invasion of North Africa and had passed the information on to the enemy. Would a treason prosecution fail if he could convince the jury that, in his fanatical and perhaps misguided way, he sincerely believed his country was on the wrong side of the war; that he sincerely believed his country's ultimate good would be served by an early withdrawal from the war; that he sincerely believed that the best, perhaps the only, way to accomplish this good end was to bring it about that the first major military operation of the United States should be a resounding fiasco, thereby stimulating such a revulsion among the American people that the perfidious administration would be forced to negotiate a peace? It is hardly necessary to state the answer to that question.

"When war breaks out, a citizen's obligation of allegiance puts definite limits upon his freedom to act on his private judgment. If he traffics with enemy agents, knowing them to be such, and being aware of their hostile mission intentionally gives them aid in steps essential to the execution of that mission, he has adhered to the enemies of his country, giving

them aid and comfort, within our definition of treason. He is guilty of treason, whatever his motive."

It only remains to be said that evidence of good motive was relevant in this case only insofar as it was evidence of the asserted psychosis. It was claimed at trial that accused's belief in the propriety of his acts sprung from a delusion. However, after the question of sanity was removed from the case by the findings, we can only conclude that this branch of the assignment of error is not well founded.

For their second point under this issue defense counsel urge that the law officer's instructions with regard to the question of "proper authority" were so inept and erroneous as substantially to prejudice the accused. A short statement of the trial situation will no doubt be helpful in bringing the issue into focus.

The accused had testified that he believed he was authorized to do many of the specific acts alleged as unlawful communication, because other prisoners, including some commissioned officers, also took part in making speeches, circulating peace petitions, and otherwise assisted the enemy. Defense counsel had placed in evidence certain portions of the Geneva Convention relating to prisoners of war which authorize prisoners to communicate with their captors concerning "intellectual diversions" or as agents of fellow-prisoners in regard to the conditions of their incarceration. Counsel then requested instructions on these subjects. The law officer first ruled that, as a matter of law, the Geneva Convention did not authorize communications such as concerns us in this instance. This, we hold, was proper, for it is the function of the law officer, and not the fact finders, to place a construction on a statute or treaty where no question of fact is raised. 53 Am Jur, Trial, § 253. The law officer informed the court-martial that, in general, prisoners of war were forbidden to communicate with their captors for any reason, but that the sovereign had granted certain exceptions to this rule,

only some of which were to be found in the Geneva Convention, and that the acts alleged here, if found, would not be within any of the Convention's exceptions. He had earlier told the court that they must find, beyond a reasonable doubt, that the accused had acted without proper authority. Therefore, the law officer contented himself with merely adding a full instruction on the defense of mistake of fact to what had gone before. This, we think, was enough.

There was no dispute but what the accused had committed the specific acts alleged under Charge I. Nevertheless, to avoid technical error, the law officer required the members to make a finding as to the occurrence of the specific acts alleged. Thereafter, he instructed with respect to the issues raised by the evidence. True enough, he informed the fact finders that a mere honest belief that his acts were authorized would be enough to exonerate the accused, but if this was error in a general intent case, it favored the accused rather than prejudiced him. It is our conclusion that no error of which the accused can complain may be found in this part of the instructions.

The last attack on the instructions under Charge I arises out of an instruction on a lessor included offense. The law officer instructed upon a form of disorderly conduct as amounting to a lesser included offense of specification 2, Charge I, which alleged wrongful communication with the enemy as a course of conduct on the part of the accused. Counsel for the accused now contend that, by failing to give the same instruction with respect to specification 1 of the same charge, the law officer implied that improper communication had been shown as a matter of law.

Let it suffice to say this: That no lesser included offense was raised by the evidence with respect to specification 1, Charge I; that at the moment we are not sure—and need not now decide—whether there is any lesser offense included in the crime charged in that specification; and that the law

370

officer never intimated any opinion as to the strength of the Government's case thereunder. There simply are no facts available to support the claim now made on behalf of the accused.

## VI

It was alleged under Additional Charge II that the accused had been guilty of misconduct while a prisoner of war, in that he had served as an informant to his captors with regard to Private Megyesi's possession of a camera. With respect to this allegation, defense counsel requested that the following instruction be given:

"Favorable treatment within the meaning of Article 105 means favorable treatment of the accused to the exclusion of all other persons. A purpose to obtain better living conditions for all prisoners of war including accused would not constitute a purpose to obtain favorable treatment within the meaning of Article 105. It is not necessary that any favorable treatment actually result."

The law officer declined to do so, and instead gave the following guide to the court-martial:

"The court is further advised that in order to find the accused guilty of Specification 2 of Additional Charge I it must be satisfied by legal and competent evidence beyond a reasonable doubt:

"One, that at Camp No. 5, Pyoktong, North Korea, on or about August 1951, the accused, without proper authority and contrary to law, customs, or regulations, in response to requests from said captors for information as to which prisoner of war had a camera and was taking pictures, made inquiry and reported to said captors that Private John Megyesi, his fellow American prisoner at said camp, was the one who had the camera and was the one his captors were looking for;

"Two, that the accused made such inquiry and report while he was in the hands of the enemy in time of war;

"Three, that the accused's purpose in making such inquiry and report was to secure favorable treatment of the accused by his captors;

"Four, that as a result of such inquiry and report, as alleged, Private Megyesi suffered detriment by being placed in solitary confinement; and

"Five, that the said Private John Megyesi was held by the enemy as a military prisoner at the time.

"Favorable treatment within the meaning of Article 105 does not mean favorable treatment of the accused to the exclusion of all other persons. A purpose to obtain better living conditions for himself and all prisoners of war would constitute a purpose to obtain favorable treatment within the meaning of Article 105. It is not necessary that any favorable treatment actually result."

Defense counsel now contend that a prisoner of war who informs on a comrade for the purpose of ▮▮▮▮▮ ameliorating the conditions of all other prisoners, including himself, does not violate this Article, no matter how hard the lot which may befall his betrayed fellow. However, this is not and cannot be good law.

In United States v Dickenson, supra, we had occasion to remark, concerning Article 105, that (page 449):

". . . Its plain purpose is to prohibit one prisoner from gaining favor with his captors at the expense of another prisoner."

Clearly implicit within that phraseology is the concept that a prisoner of war must, at all costs, avoid the act of informing voluntarily concerning another prisoner. And if he, without being compelled, informs for his own preferment, even if it is only by being a member of the class to whom benefits are extended, and he who was betrayed suffers harm because of the disclosure, the Article is violated. This Nation cannot permit any one prisoner of war to exercise a free choice as to who he will destroy merely to benefit the class to which he belongs. We are a country governed by laws and not by men, and Congress in its wisdom has seen

**371**

fit to require every prisoner to refrain from securing favorable treatment to improve his lot. We believe that only that rule insures the greatest good for the greatest number in the long run, for it insures that no one individual will be sacrificed at the election of another. When a prisoner voluntarily trades the life or liberty of a comrade for his own good, he cannot aid himself by contending that his doings also benefited a group of persons. It is our conclusion, therefore, that the law officer's instructions were sound.

## VII

This record does not present an easy case, and it is not a pleasant task to sit in judgment on a young man who yields to temptation while a prisoner of war. The conditions under which American prisoners of war in Korea were required to live were at best abominable and at worst intolerable. During the early stages, lack of adequate food, clothing, housing, and medical service resulted in a death rate which bespeaks man's inhumanity to man. Nevertheless, the accused was not subjected to any discomforts which were not shared by his comrades, and if his lot was harsh, so was theirs. At best, he was a victim of his own selfish desire to improve his internment at the expense of other servicemen; at worst, he was a soldier who betrayed his cause. In either event, it is clear that he failed to discharge his obligation to his country. If it be not so at other times, it is necessary in time of serious threat to our form of Government that this country must call upon its men in arms to withstand the horrors of war and prison to prevent an enemy from destroying that which has been our heritage for at least 167 years. It goes without saying that all men cannot stand firm against torture, physical violence, starvation or psychological mistreatment. But in this instance, the record discloses that the accused weakened when others stood fast, and it does not reveal that he was compelled to sacrifice his countrymen because of the use of those influences.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (concurring in the result):

Although I agree generally with the principal opinion, I have reservations regarding its discussion of Article 105, Uniform Code of Military Justice, 50 USC § 699. Having in mind the treatment accorded our military personnel while prisoners of war in the hands of the enemy in Korea, I can readily imagine a situation in which the sacrifice of one prisoner is essential to the preservation of the lives of all. Here, the defense counsel's requested instruction attempted to raise that issue. He emphasized that a purpose to help *all* prisoners would not constitute the "favorable treatment" contemplated by Article 105. The principal opinion implies that even such a purpose would merely confer a benefit upon a *class* and fall within the prohibitions of the Article.

In my opinion, a purpose to help *all* prisoners is not the same as a purpose to help *some;* that is, a class within the entire group. However, I need not decide whether Congress intended to treat the two situations in the same way for the purposes of Article 105. The evidence does not reasonably show that the accused informed on Private Megyesi for the purpose of helping *all* the other prisoners. According to the testimony, the accused was privately instructed, and willingly agreed, to determine the location of the camera. When he had determined its whereabouts, he reported to the camp commander. Significantly he did not tell any of the other prisoners what he had done. From these circumstances it would be unreasonable to conclude that the accused informed for the benefit of all the prisoners. Consequently, even assuming that the law officer's ruling and instructions were both erroneous, the accused was not harmed. United States v Gurevich, 7 USCMA 203, 21 CMR 329.