**UNITED STATES, Appellee,**

v.

**Private First Class Robert R. GARWOOD U.S. Marine Corps, Appellant.**

No. 47626.
NMCM 81–1892.

U. S. Court of Military Appeals.

June 3, 1985.

For Appellant: *John C. Lowe, Esq.* (argued); *J. Lloyd Snook, III, Esq., Lieutenant Commander William A. DeCicco, JAGC, USN, Lieutenant Commander Richard K. Delmar, JAGC, USNR-R, Lieutenant Commander Frederick N. Ottie, JAGC, USN.*

For Appellee: *Lieutenant Commander John B. Holt, JAGC, USN* (argued); *Captain W. J. Hughes, JAGC, USN, Commander Richard A. Monteith, JAGC, USN, Lieutenant Colonel Thomas H. Eagen, USMC* (on brief).

### Opinion of the Court

COX, Judge:

On or about September 28, 1965, appellant, then a 19-year-old Marine, was purportedly captured by enemy forces in the Republic of Vietnam. In 1973, when the majority of American prisoners were repatriated, appellant was not one of them. He returned to United States control in Bangkok, Thailand, on or about March 22, 1979, after flying from Vietnam aboard a regularly scheduled commercial flight. Shortly thereafter, he was charged with various crimes allegedly committed during his absence from U.S. control. The charges were duly investigated and referred to a general court-martial. After a lengthy trial, appellant was convicted of communicating with the enemy and assault on an American prisoner of war, in violation of Articles 104 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 904 and 928, respectively. Appellant was sentenced to be discharged from the Marine Corps with a dishonorable discharge, to forfeit all pay and allowances, and to be reduced to the pay grade of E-1. The convening authority approved the findings and sentence, as did the United States Navy-Marine Corps Court of Military Review. 16 M.J. 863 (1983). We granted review of the following issues:

### I

WHETHER THE MILITARY JUDGE ERRED IN REFUSING TO RECUSE HIMSELF AND IN REFUSING TO DECLARE A MISTRIAL AS A RESULT OF JUDICIAL MISCONDUCT.

### II

WHETHER THE PROSECUTION OF PFC GARWOOD, IN VIOLATION OF GOVERNMENTAL POLICY NOT TO PROSECUTE PRISONERS OF WAR WHO HAD VIOLATED THE UCMJ, CONSTITUTED SELECTIVE PROSECUTION, AND THEREFORE DENIED PFC GARWOOD DUE PROCESS OF LAW AND THE EQUAL PROTECTION OF THE LAWS, GUARANTEED BY THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

We resolve both issues adversely to appellant and affirm.

### I

The facts of this case have been extensively set forth in *United States v. Garwood, supra.* With reference to the first granted issue, the following excerpt is pertinent:

During the period December 1980—February 1981, ... the trial judge engaged in a number of press and media interviews involving both local media representatives as well as correspondents from national television networks.

The settings for the judge's remarks apparently ranged from comments on the case delivered in an interview outside the courtroom, to his appearance, in interviews on a CBS evening television news program, ABC news "Nighttime" program, and individual interviews with correspondents from the national television networks and the Associated Press. The content of his remarks involved the expression of his opinion regarding tactical decisions by the appellant's defense team; the relevancy of certain defense discovery items; comments, delivered to the media, which could be interpreted as disparaging the testimony of one of appellant's psychiatrists; and opinions expressing the view that appellant should

take the stand and testify regarding the charges.

On 15 January 1981, appellant's chief civilian counsel moved for dismissal of charges, or alternatively, recusal of the military judge.[1] Appellant's counsel also requested an evidentiary hearing to apparently present testimony of media representatives regarding the public statements of the trial judge. In addition, appellant's counsel desired to present evidence on the concept of "subliminal perception" and the asserted potential for transmittal of the judge's remarks to court members via unconscious reception of third party conversations, news broadcasts, and service club or other social discussions which would refer to the judge's remarks.

Judge Switzer denied defense motions to dismiss or to recuse himself, and denied the defense challenge based upon judicial misconduct. Appellant's counsel also asked for sequestration of the court members. This motion was also denied. Later in the trial, following closing arguments on the findings, appellant's counsel again challenged the trial judge for cause, asserting bias against appellant and judicial misconduct. Appellant's counsel again moved for an evidentiary hearing to present testimony and evidence on the concept of subliminal perception. This motion was also denied by the trial judge. Trial resumed and was carried through to conclusion.

16 M.J. at 868–69.

### A

■ Appellant contends, before this Court, that the military judge's conduct

1. Prior to findings, when defense counsel moved for dismissal of the charges or recusal of the military judge, the military judge invited counsel to move for a mistrial as well. However, for various stated reasons, defense counsel declined to so move. After findings of guilty were returned, when counsel renewed his challenge to the judge for cause, he was again invited to move for a mistrial. This time the motion was made, but it was ultimately denied.

2. 28 U.S.C. § 455 (which is not directly applicable to military practice, see 28 U.S.C. § 451 and

amounted to error *per se*; that he should have recused himself at trial; and that the conviction should now be set aside, regardless of whether prejudice to his case has been shown. In our view, the issue of judicial misconduct was sufficiently raised to place the burden of persuasion on the Government.

The most pertinent military standard,[2] in effect at the time of appellant's trial, for testing the suitability of a judge to sit on a particular case was paragraph 62*f*, Manual for Courts-Martial, United States, 1969 (Revised edition), which provided:

Among the grounds of challenges for cause against ... the military judge are the following:

\* \* \* \* \* \*

(10) That he has formed or expressed a positive and definite opinion as to the guilt or innocence of the accused as to any offense charged, except that this shall not necessarily apply to a military judge who has formed or expressed such an opinion solely in his role as military judge sitting alone in a previous trial of the same or a closely related case.

\* \* \* \* \* \*

(13) Any other facts indicating that he should not sit as a ... military judge in the interest of having the trial and subsequent proceedings free from substantial doubt as to legality, fairness, and impartiality ....

See also *United States v. Kincheloe*, 14 M.J. 40 (C.M.A. 1982).

Judged by these standards, we are satisfied that the military judge's actions did

*United States v. Frischholz*, 16 U.S.C.M.A. 150, 36 C.M.R. 306 (1966) ), is similar in providing that:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

not disqualify him from participating in the trial. To be sure, his comments exceeded the permissible scope of public discussion of an on-going trial by a sitting judge; and quite properly, the Court of Military Review (16 M.J. at 869) has chastised him for violating Canon 3 A(6) of the American Bar Association's Code of Judicial Conduct.[3] *United States v. Garwood, supra* at 869–70; *cf. United States v. Haldeman*, 559 F.2d 31, 134 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Nonetheless, a close reading of the record discloses no statement or action by the judge which impugned his integrity, fairness, or impartiality either in general or with respect to this particular case.[4] Furthermore, there is no suggestion that he had formed or expressed an opinion as to appellant's guilt or innocence.

An instructive case, by way of contrast, is *Mayberry v. Davis*, 608 F.2d 1070 (5th Cir. 1979). There the trial judge, out of the presence of the jury and in response to the petitioner's assertion of innocence, stated that he believed petitioner to be "guilty as sin." The Court of Appeals concluded that "the judge's opinion was clearly based on evidence that had been presented during the course of the trial" and "did not violate any constitutional right of petitioner." *Id.* at 1072.

Manifestly, nothing in the instant case was said by the military judge which even approached the remark in *Mayberry*. The very worst thing that can be said of the judge's comments here is that they too candidly revealed his impressions of the case, based on the information then available to him. Thus, it is our conclusion that the record establishes that, while the military judge erred in speaking out to such an extent, he was not personally compromised or tainted in his role as a neutral and detached magistrate.

## B

■ Given that conclusion, did the judge's public comments nonetheless infect the court-martial proceedings? The Court of Military Review's findings in this regard are germane:

More importantly, we find, after examining the extensive *voir dire* of the court members; their candid responses regarding attempts by press representatives to interview them; their rebuffs of such attempts; their adamant statements denying both any knowledge or contact with press, radio, or television reports of the case throughout their period of appointment to the court and their denial of any individual, social, or other contact or discussions regarding the case, no indication of prejudicial impact on the members of the court.

16 M.J. at 870.

Like the court below, we, too, are impressed with these court members' scrupulous adherence to duty in avoiding media contact. Moreover, as appellate defense counsel concede, there is no evidence that any of the court members ever *consciously* heard or read any descriptions or accounts of the military judge's off-the-record remarks. Rather, their contention is essentially that, inasmuch as such descriptions and accounts appeared periodically in the various media during the pendency of the court-martial, it is almost inevitable that some of this information was conveyed to the court members *subconsciously*—or at least that the Government cannot demon-

---

**3.** Canon 3 A(6) states:

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

**4.** Admittedly, it appears that certain of the reporters may have failed at times to grasp the legal significance of some of the military judge's comments. Thus, several of the articles published in local newspapers attributed rather misleading statements to him. Of course, this is a risk a judge runs any time he lets the press question him about a pending case; and it opens up an unnecessary avenue for impermissible matter to come to the attention of court members.

strate that it was not so conveyed. On this basis, counsel ask this Court to *presume* prejudice and to set aside the conviction.

To bolster this contention defense counsel at trial proffered that an expert witness "would testify that between now and the end of the trial, it's very possible that the members might hear that information and not even realize that they've heard it, receive it at subliminal level, and be affected by it." As previously indicated, the military judge declined to permit such testimony.

To further support this contention, the defense submitted, at the Court of Military Review, an affidavit by the same expert which stated essentially: that "unconscious or subliminal" perceptions are "well-recognized" psychological phenomena; that information received as such can affect "feelings, perceptions, opinions and other rational judgments ... without" the recipient's knowledge; that the effect of such information can depend "on the credibility of the source"; that "subliminally received information from the mouth of the military judge" would tend to "have a substantial" impact on the opinion and judgment of a court member; that "[t]here is no way to question a court ... member about the effect of subliminal perception," since they are "perceived, retained and effective at an unconscious level"; and that if a court member subliminally perceived the military judge as suggesting that appellant needed to take the stand "to have any chance of being acquitted," there was "a substantial risk that the court ... member would believe those comments to be true." However, it is significant, in our opinion, that there is no suggestion by the expert that such subliminal perceptions would necessarily override the evidence presented to the members in open court or the explicit legal instructions provided by the military judge.

For the purpose of resolving this appeal, we shall accept the validity of the expert's assertions in their entirety. In any event, certain of them strike this Court as self-evident. Nonetheless, we decline to set aside appellant's conviction on this basis, for were we to accept the proposition that unconsciously received perceptions were sufficient to disqualify otherwise qualified court members from participating in courts-martial, then it would appear that relatively few serious crimes could ever be prosecuted before members. Such a result would be too costly, both to society and the accused, and is, moreover, unnecessary.

The system of military justice, like its civilian counterpart, depends heavily on the honesty and integrity of the court members (or jury) to decide cases based only on the law and evidence as presented to them in open court. Admittedly, a perfect trial, as with any other human endeavor, can never be more than the goal. However, within the limitations of human nature, we can expect—and demand—an absolutely first-rate effort on the part of court members. Our review of this record convinces us that appellant received such an effort by these court members. He can reasonably ask for no more. Therefore, even assuming that some quantum of subliminal information was received by one or more of the court members, we decline to presume that appellant was prejudiced thereby.

II

The second issue on which review was granted concerns an allegation by appellant that he was unfairly singled out for prosecution, while others in similar circumstances were excused. Again we look to the Court of Military Review for the basic factual context of this issue:

Appellant presents on his behalf extensive documentation of named members of the U.S. armed forces who were suspected of offenses during the Vietnam conflict, supposedly similar in degree to his own charges, and who were not prosecuted under the court-martial process applied to him. Appellant presents extensive documentation of Defense Department and Navy Department directives and memoranda which present departmental views that those prisoners of war who were returned during the

celebrated 1973 "Homecoming" repatriation would not be prosecuted for "propaganda statements" made while in captivity.

There is additional documentation in the form of news reports of statements made by Department of Defense officials, including two Secretaries of Defense. Memorandums from the Secretary of the Navy and the Judge Advocate General of the Navy are offered to support appellant's further contentions that specific decisions were made not to prosecute named members of the naval service, including a senior officer in the Navy, and a senior officer in the Marine Corps, as well as two Marine noncommissioned officers. These servicemen had been the subject of specific charges by other former prisoners of war held in North Vietnam. The charges alleged against the two naval service officers involved allegations of communication and cooperation with the enemy, making of propaganda statements, inducing of insubordination by their fellow prisoners against senior U.S. officers interned in the camp, and informing on fellow prisoners of war. The charges alleged against the two Marine noncommissioned officers involved allegations of making propaganda statements, communication with the enemy, disobeying orders, and acceptance of favors from the enemy. Certainly Private First Class Garwood has presented extensive evidence of other former prisoners of war who were allegedly violators of the Code while in captivity.

*United States v. Garwood, supra* at 871.

In essence, appellant contends, as he did at trial, that a form of amnesty or pardon, actual or *de facto*, existed which operated to the benefit of several other former prisoners of war and should have applied to him as well. Appellant's contention was litigated extensively at trial and, in the end,

was decided adversely to him by the military judge.

"Pardon" is defined as

forgiveness, release, remission: forgiveness for an offense, whether the person committing it is liable in law or otherwise; release from pecuniary obligation; or remission of a penalty to which one may have subjected himself by the nonperformance of an undertaking, contract, or statutory obligation.

On the other hand:

Amnesty is defined ... [as] an act of the sovereign power granting oblivion, or a general pardon for a past offense, and is rarely, if ever, exercised in favor of single individuals, but is usually exerted in behalf of certain classes of persons who are subject to trial but have not yet been convicted.

59 Am Jur 2d, *Pardon and Parole*, §§ 3 and 5 (footnotes omitted). *See United States v. Batchelor*, 7 U.S.C.M.A. 354, 22 C.M.R. 144 (1956).

The evidence of record leaves absolutely no doubt that there was a limited *policy* of nonprosecution for propaganda statements. Indeed, it is clear that what constituted propaganda statements was to be construed liberally to include related conduct that would not ordinarily fall into that category. This policy was carefully developed and coordinated by high-level officials during President Richard M. Nixon's administration and was based on legal and political, as well as humanitarian, considerations. However, it is equally clear, as the military judge found, that no *amnesty* or *pardon*, as such, issued for crimes committed by servicemembers while prisoners of war in Vietnam.

█ A question that immediately presents itself then is: does one administration's policy of forbearance from prosecution extend through the next administration and into a third and fourth administration [5], so as to preclude subordinates of the

---

**5.** We take judicial notice that Richard M. Nixon's second term of office as President of the United States began on January 20, 1973, and ended on August 9, 1974. Thus, he was in office during the 1973 "Operation Homecoming," when supposedly all of the American P.O.W.s were released from Vietnam. Gerald R. Ford's term of office as President ran from August 9,

latter two administrations from exercising their statutorily conferred prerogatives? [6] We think the answer to this question is, self-evidently, no.

■ But in any event, the following is well-established:

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). *See Wayte v. United States*, ___ U.S. ___, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *United States v. Ross*, 719 F.2d 615 (2d Cir. 1983); *United States v. Greene*, 697 F.2d 1229 (5th Cir.), *cert. denied*, ___ U.S. ___,

103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Torquato*, 602 F.2d 564 (3d Cir.), *cert. denied*, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979); *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973)(en banc); *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972).

■ Since appellant was repatriated long after the other American prisoners, we have some doubt whether he even makes a colorable claim that there were others similarly situated against whom his treatment can be measured. However, we need not rest our decision on that ground, since there is simply no evidence of "bad faith" or "invidious" prosecution, as defined in *Berrios*. *See Wayte v. United States, supra*, 105 S.Ct. at 1531–32. It follows that appellant has not been the victim of discriminatory or selective prosecution and that his equal-protection and due-process rights have not been violated.

Accordingly, the decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

1974, to January 20, 1977. Jimmy Carter's term of office as President commenced on January 20, 1977, and terminated on January 20, 1981. Thus, he was President when appellant was repatriated and during the majority of his court-martial. Ronald Reagan assumed office on January 20, 1981, and was still President when appellant's sentence was adjudged on February 17, 1981.

**6.** We note that there is absolutely no indication in the record that this limited policy of nonprosecution was ratified or extended by the Carter administration, under which the charges were ultimately brought against appellant.