UNITED STATES, Appellee

v

HARRY FLEMING, Lieutenant Colonel, U. S. Army, Appellant

7 USCMA 543, 23 CMR 7

No. 7943

Decided February 8, 1957

*Major Frank C. Stetson, Allen E. Gramza, Esq.,* and *Alfred E. LaFrance, Esq.,* argued the cause for Appellant, Accused.

*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused Army officer was tried by general court-martial for three specifications alleging violations of Article of War 95, 10 USC § 1567 (1946 ed) (Charge I), two specifications—reciting similar acts—allegedly violative of Article of War 96, 10 USC § 1568 (1946 ed) (Charge II), one specification of violating Article 133, Uniform Code of Military Justice, 10 USC § 933 (Charge III), and an identical specification purportedly violating Article 134, Uniform Code of Military Justice, 10 USC § 934 (Charge IV). He pleaded not guilty to all charges and specifications but was convicted with certain exceptions and substitutions of specification 3 of Charge I, specification 2 of Charge II, and the specifications and Charges III and IV. The accused was sentenced to total forfeitures, and to be dismissed from the service. After modifications of the findings, the convening authority approved the findings and sentence. An Army board of review, exercising its fact-finding powers, disapproved the findings of guilty of Charges III and IV and, after excepting an allegation from the identical specifications laid under Articles of War 95 and 96, supra, affirmed the findings of guilty and the sentence. In order to more clearly understand the case, the now remaining allegations in the two identical specifications of which the accused now stands convicted state as follows:

That the accused, "then Major and held as a prisoner of war by the enemy, did at or in the vicinity of Pyongyang, North Korea, between 1 February 1951 and 30 May 1951, willfully, unlawfully, and knowingly, collaborate, communicate, and hold intercourse directly with the enemy by joining with, participating in, and leading discussion groups and classes reflecting views and opinions that the United Nations and United States were illegal aggressors in the

**547**

Korean conflict, . . .[1] and by participating in the preparation and making communist propaganda recordings designed to promote disloyalty and disaffection among United States troops, by praising the enemy and attacking the war aims of the United States, which recordings were later broadcasted in English over the Pyongyang radio, to wit: a statement which was broadcasted on or about 13 April 1951, stating in effect that the communists were treating prisoners of war in accordance with the principles of humanity and democracy, and that the United States made a grave error in interferring [sic] in Korean internal affairs and should leave at once; an appeal to the 'Five Great Powers' (USSR, Peoples Republic of China, United Kingdom, United States, and France) broadcasted on or about 24 April 1951, urging them to sign a peace pact, and urging that any one of the powers which refused to attend conferences for that purpose be considered a government with aggressive intentions; an appeal to President Truman and General McArthur [sic] broadcasted on or about 24 April 1951, urging them to withdraw United Nations forces immediately from Korea; a surrender appeal broadcasted on or about 27 April 1951, inviting United Nations Troops to surrender and promising kind treatment by the communists; and a round-table conference or panel of five prisoners of war broadcasted on or about 4 May 1951, urging support for the Communist sponsored Second World Peace Congress, in which he served as moderator; thereby giving aid and comfort to the enemy."

This Court granted the accused's petition for review, setting forth in pertinent part the following issues:

1. Whether the evidence is sufficient to support the findings of guilt.

2. Whether the law officer erred by instructing the court that in order to excuse a criminal act on ground of coercion, compulsion, or necessity, one must have acted upon a well-grounded apprehension of immediate and impending death or of immediate serious bodily harm.

3. Whether the law officer erred by refusing to give the defense requested instructions on partial mental responsibility.

4. Whether the law officer erred by instructing the court that the punishment for the offenses of which the accused was convicted included confinement at hard labor for life.

5. Whether the law officer erred by admitting into evidence Prosecution Exhibits 3, 5, 3a and 5a.

6. Whether employment by the accuser and the convening authority of pleadings designated by the accused as embodying a "shot gun" technique prejudiced the accused.

The record before us in this case is voluminous and the two specifications remaining for consideration recite a course of conduct which permeates the entire trial record. Therefore a detailed statement of the facts will be necessary. There is, however, little dispute between the parties as to what happened. Basically the issue boils down not so much as to what the accused did or did not do, but rather to the justifications for his actions. As stated in the defense appellate brief, "the issues with which we are here concerned are not the acts of the accused but whether the affirmative defenses of these acts were rebutted by the prosecution evidence."

The accused was captured by the Chinese Communists near the Yalu River in the northern reaches of Korea. After his capture he was marched to different locations and ended up being interned in the Valley Camp for about two months and for a month at a camp near Pyoktong. At the Valley Camp an English-speaking North Korean officer, whom we will hereafter refer to as Colonel Kim or Kim, informed the accused that arrangements were being

---

[1] This omission "and extolling the virtues of communism" is the portion of the specifications excepted by the board of review in their decision dated July 28, 1955.

made to enable the prisoners to broadcast radio messages informing their families of their whereabouts. On January 29, 1951, Colonel Kim notified the accused, Lieutenant Colonel, then Major, Liles, and Major MacGhee, the three senior American officers in this particular prisoner of war group, that the time had arrived for the broadcast. The day following, these three officers, in company with seventeen other prisoners, departed by truck for Pyongyang. En route, the party stopped at the badly damaged village of Tackchon. The populace was hostile and evinced a threatening attitude toward the prisoners. A People's Court or Town Meeting was called, attended by about eighty-five Korean civilians. Questions were asked by the villagers as to why the Americans had come to Korea. According to a number of witnesses at the trial, most of the questions were answered by the accused and Colonel Liles through Colonel Kim, who acted as interpreter. Captain Galing testified that the accused stated that South Korea was the aggressor; that the war was propagated at the instigation of the imperialistic war mongers of Wall Street; and that President Truman and General MacArthur were the tools of the Wall Street conspiracy. Major MacGhee could not recall the accused specifically answering any questions; however he did remember that the answers given were to the effect that the United States was the aggressor in Korea; that its forces had no business there, and that the war and slaughter should be ended. The accused admitted that in order to placate Kim and the hostile and threatening crowd, he *might* have used some "party line" phrases.

Upon arrival at Pyongyang on February 2, 1951, the accused was elected compound leader. Not only was he responsible for the discipline and organization of the prisoners but he was also the link between the prisoners and Colonel Kim. He transmitted the captors' orders to the prisoners of war, and, conversely, the complaints and requests of the group to their captors. The accused held the position of group leader until June 1, 1951, at which time Captain Allen succeeded him.

After arrival at Pyongyang, Kim informed the prisoners that they were to prepare radio scripts describing their capture and Korean experiences. The accused testified that up to this time his idea had been only to let his wife know he was alive. To that end the accused submitted a short script. This was returned and he was informed by Kim that his broadcast time had been lengthened to fifteen minutes. The script was written, rewritten and revised some twenty or thirty times until finally broadcast. According to the accused he resisted the propaganda directed against President Truman along with demands that only United Nations troops be withdrawn from Korea. He testified that he succeeded in getting by with comments about the Roosevelt administration and a statement that *all* foreign armies—which of course included the Chinese—be withdrawn from Korea. Also included in the broadcast were statements that the prisoners were being treated according to the principles of democracy and humanity, and that the United States erred when it interfered in the internal affairs of Korea.

The accused testified that after the broadcast, Kim informed him that he was dissatisfied with the cooperation he had been receiving from the prisoners. They were insincere and, apparently to educate them, he was going to commence round-table discussions. The accused objected, but he was forced to pick four other prisoners to participate in a panel discussion, of which he was to act as moderator. Subsequently a month was spent in preparation of the script, after which time the panel discussion recording was made. The subject matter was the "Second World Peace Congress." The accused testified that Kim had inserted in the script as broadcast a number of his own Communist line phrases. A member of the panel, Lieutenant Wilson, testified that included among the points discussed were reduction of armaments and the outlawing of mass destruction weapons.

While the round-table script was being prepared, Kim read several "appeals" to the prisoners. The substance of these appeals is related in the specifi-

cations. In brief, they were for a Five Great Powers Peace Pact; for President Truman and General MacArthur to withdraw United Nations forces from Korea; and for the United Nations troops to lay down their arms and surrender, being assured of kind treatment by the Communists. Each appeal was reduced to writing on a separate sheet of paper. They were laid on a table and a blank sheet for signature was placed underneath. The accused testified that he wrote his name on two of the blank sheets of paper. However, blank sheets of paper, or not, he pointed out that it made little difference whether the prisoners did or did not sign the appeals, for the Communists had already obtained the prisoners' signatures and would simply superimpose any signature upon any publication or article they desired.

Toward the end of April 1951, the prisoners were taken to a Korean house, which had electricity, where the roundtable discussion and the appeals were to be recorded. After the panel discussion was recorded, the appeals were read into the microphone. When an appeal was read, each prisoner by order of rank trooped to the front of the room and "voice signed" his name, rank and serial number. The accused admitted voice signing the Five Great Powers Peace Conference Appeal. However, he and the other prisoners objected to signing a *demand* to President Truman and General MacArthur to withdraw United Nations troops from Korea. The prisoners finally prevailed in that the word "demand" was changed to "appeal." The accused then voice signed it. In addition he admitted voice signing the surrender appeal. After the accused and Colonel Liles had voice signed the latter appeal, dissension began to develop among the prisoners in the back of the room. This dissension grew into outright refusal to sign this appeal. The objections became so vehement that Kim thereafter abandoned any attempt to secure voice signatures to the surrender appeal.

To keep the picture in focus, it is advisable at this point to drop back and pick up the coercive circumstances leading up to the accused's surrender, and

his participation in the propaganda broadcasts. The accused testified that just before his capture, while firing upon the enemy, he was rendered unconscious by a shell blast. The blast resulted in approximately fifteen superficial wounds in his back and legs. His first recollection after the blast was being kicked in the head by a Chinese soldier. He struggled to his feet and noticed a wounded fellow officer who had been his assistant as an advisor to a South Korean regiment. While prevented at bayonet point from rendering aid to this officer, another Communist soldier walked over to where he lay and killed him with a burp gun. The accused was marched south about seventy miles. He was questioned on numerous occasions and during one of the interrogations, when he continued to refuse to give more than his name, rank and serial number, he was physically abused by being slapped, knocked down, kicked, and pushed around on the floor. For about ten days he was given practically no food and water. He was subsequently taken to the Valley Camp. By this time, due to wounds, mistreatment, malnutrition and debilitation, he had lost approximately forty pounds. Conditions at the Valley Camp—not only according to the accused, but other prisoners as well—were extremely bad. Few of the captured soldiers had other than summer clothing. The accused in company with twelve other prisoners, occupied one small room. There was not enough space for all the prisoners to lie down at night and stretch out. Two cups of millet per day constituted the daily sustenance. Approximately sixty per cent of the prisoners were unable to walk and the mortality rate was so high that the dead were not buried for days, merely stacked up like cordwood outside in the freezing weather. The accused made numerous demands upon his captors for more food and for other necessities of life, such as medical attention and medical supplies for the sick and wounded. He felt that he was able to restore some type of discipline, organization, and the will to live among the prisoners. Toward the end of 1950 the prisoners were marched to another location. The accused testified that due

550

to his intercessions, the sick and wounded were carried in ox carts, instead of being marched on foot, which would have resulted in death to a sizable number. The accused was himself so weak that he was unable to carry his own knapsack. Conditions at the new camp were as bad, if not worse than those at the original location. The accused continued his efforts to obtain better treatment from his captors.

After the twenty prisoners arrived at Pyongyang, the food and living conditions markedly improved.

Before making the broadcasts, the accused testified that he was constantly harangued and pressured by Colonel Kim. According to Kim, there were two kinds of people: those for peace and those against peace. Those against peace were war criminals and not fit to live. If the accused fitted into that category he would be put in a "hole" and would never come out. But if he were for peace, he was a friend. His actions would indicate whether he was for or against peace. When the accused initially refused to do the acts to prove his "friendliness," he was asked if he wanted to return to the previous camp up north. The accused replied in the affirmative and Kim informed him that he could start walking the 150–200 mile distance. It was midwinter, the accused's shoes had been stolen, and he was wearing rags wrapped around his feet. These factors, plus his greatly weakened physical condition, led the accused to the conclusion that he would never reach the north camp alive. Thereafter, on each occasion when the accused objected to Kim's propaganda efforts, he was threatened with the walk north.

Colonel Liles testified that when Kim insisted on the manuscripts being prepared, the accused informed him that the prisoners could not comply unless more food was forthcoming. Kim promised to try to accomplish that objective, but subsequently returned and said he was unable to secure additional rations. In the meanwhile nothing more had been done on the manuscripts. Kim was angry and declared that any man who refused to make a radio recording would march back to Pyoktong on foot. After this threat, the writing commenced. Major Allen also testified to numerous threats to march the prisoners north to the Yalu River. In his opinion, none could have survived the march.

The accused ascribed as further reasons for lending support to the round-table panel and the appeals, the fact that due to his weakened physical condition and the constant phychological hammering of Colonel Kim, he was in a state of complete confusion, frustration, and hopelessness. Morale among the prisoners had reached bottom. The food was barely sufficient to sustain life, and during the arguments over the appeals Kim even threatened to cut that off.

Also Kim's subsequent threat of the caves made to the accused and the other prisoners of war unless they cooperated undoubtedly affected prisoner cooperation. After completion of the accused's broadcast at Pyongyang, the prisoners were moved to a location near the caves. The latter were recesses in the hillside. They were wet and muddy with little or no heating facilities. The prisoners lived in the muck and mire like animals. Primarily the caves were used for South Korean prisoners, but also some American and British soldiers were incarcerated there. Also a great many transient, sick and wounded, and in some instances recalcitrant prisoners, resided in the caves. The mortality rate in the indescribable filth and privation of these holes in the ground was extremely high. The prisoners felt that a sentence to the caves was almost tantamount to a sentence of death. Of the prisoner group with whom the accused was associated at least eight were punished by being sent to the caves. Fortunately these eight survived, except that one officer died shortly after being taken out of the caves because of his weakened condition. Almost all who testified were of the opinion that had their confinement in the caves lasted much longer, they would have died. Major MacGhee, one of the officers sentenced to the caves, testified that all twenty-three Ameri-

cans already there when he arrived died.

The accused testified that when he objected to a round-table discussion, Kim took him to see fourteen recently captured young American enlisted men huddled together in the filth of a small cave. They were sick, dirty, had no latrine, little water, and no hope. The accused tried to get them moved to his camp, and they pleaded with him to try to accomplish this objective. Kim kept the accused "dangling" with vague promises. According to the accused, whenever he balked on the propaganda, Kim reminded him of the Americans in the caves and again took him to see them. Each time marked fewer numbers. On the last trip only one American remained. He was lying in the mud, too sick to rise, and he informed the accused that all the rest had died, and that he too was dying.

Discussion groups were formed and classes were held in the prisoner of war camp. Initially, Mr. and Mrs. Suh came over in the evenings and discussed political matters. These discussions and subsequent developments will be related through the witnesses.

According to Captain Galing, after the twenty prisoners were taken to Pyongyang, Kim or his secretary, Suh, came to their rooms on a number of occasions and one or two hour discussions would be held with respect to who started, and who was responsible for the Korean war. Magazine articles were sometimes read, followed by questions. The accused responded to these questions and some of his statements were to the effect that South Korea was the aggressor; that Americans had no business interfering in a Korean civil war, and that Wall Street was backing the war for financial gain.

Major MacGhee testified that study classes were supervised by Suh or Colonel Kim. These classes were held in the evenings after Communist propaganda for study had been given to the accused for distribution to the prisoners during the day. During the study sessions one of the prisoners would be called upon to read a portion of the material and thereafter the group would discuss it. Mac-

Ghee recalled that on one such occasion, the accused made remarks with respect to business in America, which highlighted the decadence of capitalism. Quite often the Korean who had commenced the class would leave. When that happened, normally the accused or Colonel Liles led the discussion.

Lieutenant Wilson testified that he remembered the general tenor of one of the articles discussed was that the "people" were speaking out for peace, disarmament, and the outlawing of weapons of mass destruction. Wilson was aware of the fact that the accused participated in a number of the discussions, but he had no present recollection of what he said.

Master Sergeant Christie recalled that he remembered hearing the accused and other prisoners of war discuss the eventual collapse of the monopoly controlled American economy. On one occasion the accused used as an example Argentina, pointing out that with a lower standard of living, it could produce wheat on the world market cheaper than the United States.

When the twenty prisoners, together with another group of fifteen prisoners who had joined them two weeks earlier, were moved to the new location near the caves—sometime in March 1951—two-hour indoctrination classes were held during the day followed by two-hour evening discussion periods. Sergeant Gardiner testified that the accused appeared to be in charge of these evening sessions. He could not recall that anything anti-American was stated by the accused. A number of witnesses testified that when the Korean monitors left the room, the accused would slant his discussion favorably to the United States.

John Narvin, formerly private first class, recalled being posted by the accused to watch for the Koreans during one of the discussions. Colonel Liles testified that when the captors were absent the accused attempted to point out flaws in the Communist system.

An article appearing in a North Korean magazine bore the accused's name and picture. It stated that United States forces should leave Korea. The

accused testified that although he did not author the article it appeared to contain language similar to his first broadcast. He pointed out that it was an easy matter for the Communists to obtain one's picture and signature on any publication they desired. They frequently took pictures of the prisoners and had everyone's signature.

After June 1st, 1951, Captain Allen was elected group leader and the accused was made librarian. He was responsible for a considerable quantity of Communist propaganda. He did not let the prisoners use the material for toilet paper because it was inventoried and he was held responsible for the missing items.

The accused's policy with respect to cooperation with the enemy by the other prisoners was predicated upon his belief that every prisoner had to be guided by his own conscience. The record is clear that Fleming did make statements to that effect to a number of the prisoners. But there is also testimony in the record that he urged some of the prisoners to complete propaganda writings and not hold back from involvement in the political activities or else Kim might make some changes. The accused's idea of his policy as to the propaganda activities can best be described by his own testimony. He testified:

"A. I know in my own mind that if I had taken the policy of saying to these men: 'Resist them; everybody resist them,' that information would have gone to headquarters so fast that they would have known it about as fast as everybody else. And I had a pretty good idea of what would happen to me.

"Secondly, I then would be the individual responsible for any beatings, tortures or deaths that may occur to any one of the men there.

"Another thing was that a policy like that was absolutely not practical because you have to take human nature into this thing. They wouldn't have done it.

"So it had to be one where the individual himself, in the final analysis, was going to be the one that

said: 'I stop here regardless of what happens.'

"And I am firmly convinced in my own mind that the policy was right. It proved itself right when the flare-up came during the recordings of the so-called appeals; when some of these people went to the end and stopped, and that was it.

"That is the only policy I could see that would have any practicability at all and be workable.

"By doing that we could resist in every way that we could think of as individuals. I resisted in every way that I could, and I know that every other individual resisted in every way that he could, and the resistance was different as the situations developed. Some of it was blunt resistance; some of it was passive; some of it took the turn, as I have mentioned so many times, of delay, double talk, sabotage, not understanding, everything we could think of to hold off.

• • • • •

"A. I felt this way, and this was certainly nothing new at Camp Twelve. It had started long before I had anything to do with Camp Twelve. The most futile thing in the world was a dead prisoner of war in North Korea. And I had determined a long time before this that I was going to do everything in my power to keep those people alive. By doing so I was, in some small way, defeating what the Communists were trying to do.

"As I said before, the best thing that could happen to the Communists was to have us all die. And, secondly, in a situation like that you have many thoughts of home. I thought, and everyone else thought—not only thoughts of just yourself getting home, but the thoughts of those people at home that are waiting for you to get home, the mothers, and the wives, and the fathers. And the way I feel about it personally is, and I think I am right, that for these men that came back that may have done things wrong over there, it means more to their mothers and their families than a little bit of Com-

**553**

munist indoctrination that actually may have more Communist heroes than anything else.

. . . . .

"A. I feel that there are innumerable officers and enlisted men that have had a long-time experience as prisoners of the Communist armies, that can give invaluable information to not only the American military establishment as to what can be done to better the situation if and when we fight the Communists again, for those that may be captured in the future; lessons that were learned by our mistakes, and by the suffering of the men that were over there. But also to show the American people our side of what Communism really is. And, believe me, the American people need to be shown."

There is evidence in the record that by virtue of the accused's efforts more favorable conditions were obtained for the prisoners. A kitchen was set up with some degree of cleanliness, which helped reduce dysentery which was fatal to so many prisoners in Korea. Some semblance of discipline was restored and the prisoners were forced to exercise and follow a more or less military routine. They were not allowed, as Fleming testified, to merely lie down, give up and die. On at least one occasion, the accused obtained hospitalization for two prisoners which possibly saved their lives. Also he was able to secure a certain amount of medical attention and supplies. He pushed some of his demands so forcefully that, according to his testimony, on at least two occasions Colonel Kim flew into a ranting rage, pulled out his pistol, and threatened to kill him. Other witnesses testified that they recalled one instance when the accused was forced to get up before the prisoner group and condemn himself for his persistent behavior.

To counterbalance the scale, there is evidence that a number of prisoners reached a point from which they refused to budge with regard to Communist propaganda. These prisoners unquestionably knew that their refusal would mean banishment to the caves. They nevertheless threw back the challenge to their Communist captors and refused to go any further. One British soldier, Sergeant O'Hara, refused from the inception to have anything to do with the Communist propaganda. A devoutly religious man, he was apparently able to withstand the Communist pressure. He eventually ended up in the caves but survived the war.

Evidence was introduced of the accused's outstanding military record.

There was psychiatric testimony that the accused was able at the time of the commission of the offenses to distinguish right from wrong and to adhere to the right. However, both psychiatrists—one for the accused and one for the Government—declared that under the circumstances described, the extreme stress and privation *impaired* the accused's ability to adhere to the right.

The assignments of error in this case will be taken up seriatim:

I

*Is the evidence sufficient to support the findings of guilty?*

As previously stated, there is actually little dispute on the facts. For all practical purposes the accused admits that he committed the acts alleged but insists that under the circumstances he was justified in so doing. According to the accused the acts were committed (1) to protect the lives and well-being of the fellow-prisoners of war; (2) under coercion and duress; and (3) while incapable of adhering to the right. These defenses will be dealt with chronologically.

There is considerable evidence in the record indicating that the accused was motivated—in part at least—by the well-being of his fellow-prisoners of war. There is other evidence, however, which casts a doubt as to the accused's primary motivation. Major MacGhee testified that when he refused to make a recording, Fleming informed him that he, Fleming, would have to report to Colonel Kim that MacGhee had double-crossed him. Within a short space of time thereafter MacGhee was transferred to the caves. According to Ser-

geant Gardiner, the accused informed him that if he didn't straighten out he would be "shipped to the caves." Lieutenant Van Orman recalled that the accused told him that Kim's "got his eye on some of the people laying down around here and trying to get by and not get involved in the political program." And "Kim is getting sick of people hanging around here who are not producing, and is thinking about lowering the strength of the camp." Van Orman took the last statement to mean that if he didn't start cooperating, he would be transferred to the caves. But under the circumstances of this case, as it pertains to the issue now under discussion, we will assume that the motives of the accused were to "protect the lives and well-being of his fellow prisoners of war." However, good motives are not a defense to a crime.

In United States v Batchelor, 7 USCMA 354, 22 CMR 144, the Court had before it the defense contention that under the law officer's instructions the members of the court-martial could convict the accused if they were satisfied that he had voluntarily and knowingly communicated with the enemy without proper authority "even though the accused believed his acts contributed to world peace and the best interests of his fellow-prisoners and his country." The Court concluded that "the instruction is a good statement as to what the law is in this field," adding:

". . . The question then becomes one of whether what might be a laudable motive—in entirely different circumstances—will serve to exculpate a defendant charged with improper communication with the enemy.

"In Chandler v United States, 171 F2d 921 (CA 1st Cir) (1948), the accused, an American citizen, was charged with treason. It was argued that treason is a crime dependent upon the actor's motives, and that the jury should have been told that the defendant could not be found to have had an 'intent to betray' if they believed that he acted from patriotic motives upon a firm conviction that what he did was for the best interests

of the United States. The Circuit Court rejected this argument, and we believe its language is appropriate here. Chief Judge Magruder, the organ for the court, disposed of the matter as follows:

'. . . if appellant's argument in this connection were sound, it would of course be applicable whatever might be the character of the overt acts of aid and comfort to the enemy. Suppose Chandler had obtained advance information of the Anglo-American plans for the invasion of North Africa and had passed the information on to the enemy. Would a treason prosecution fail if he could convince the jury that, in his fanatical and perhaps misguided way, he sincerely believed his country was on the wrong side of the war; that he sincerely believed his country's ultimate good would be served by an early withdrawal from the war; that he sincerely believed that the best, perhaps the only, way to accomplish this good end was to bring it about that the first major military operation of the United States should be a resounding fiasco, thereby stimulating such a revulsion among the American people that the perfidious administration would be forced to negotiate a peace? It is hardly necessary to state the answer to that question.

'When war breaks out, a citizen's obligation of allegiance puts definite limits upon his freedom to act on his private judgment. If he traffics with enemy agents, knowing them to be such, and being aware of their hostile mission intentionally gives them aid in steps essential to the execution of that mission, he has adhered to the enemies of his country, giving them aid and comfort within our definition of treason. He is guilty of treason, whatever his motive.' "

In United States v Schniederman, 106 F Supp 906, 930 (S.D. Calif) (1952), the Federal District Court had before it, allegedly, violations of the Smith Act; i.e., teaching and advocating the

**555**

overthrow of the United States Government by force and violence. With respect to motive, the court made the following observation:

"Intent and motive should never be confused. Motive is that which prompts a person to act. Intent refers only to the state of mind with which the act is done.

"Personal advancement and financial gain are two well-recognized motives for much of human conduct. These laudable motives may prompt one person to voluntary acts of good, another to voluntary acts of crime.

"*Good motive alone is never a defense where the act done is a crime.* If a person intentionally does an act which the law denounces as a crime, motive is immaterial except insofar as evidence of motive may aid determination of the issue as to intent." [Emphasis supplied.]

The evidence in the instant case is ample to support the conclusion that the accused intended to do the acts charged. Since, as we will hereafter discuss, the offenses here require no specific intent, the accused's motives are immaterial, except, of course, as they relate to the determination of an appropriate sentence.

The accused next argues that the evidence is insufficient because he was excused from the legal consequences of his actions by virtue of duress and coercion. In substance, the law officer instructed the court that in order to convict it had to find beyond a reasonable doubt that the accused *did not* act under a well-grounded apprehension of immediate and impending death, or of immediate serious bodily harm. The trial court did not so find. The members of the court had all the facts laid before them. Whether or not they chose to believe Fleming and, if so, to what extent, was a matter solely within their province. They had the right to assess to the witnesses, including the accused, whatever weight they desired, in the light of all the testimony in the case. Being the sole judges of the credibility of the witnesses, they were entitled to accord to the evidence such weight as they considered under all the circumstances of the case it merited under proper instructions. The real issue then is whether the instructions on the claimed defense of duress and coercion were legally correct. This issue is decided in subdivision II hereinafter. Since this Court cannot weigh the facts as to this, for the accused to prevail we would have to find as a matter of law that the accused's actions were committed under a well-grounded apprehension of immediate death or serious bodily harm. Although by civilized standards conditions in the prisoner of war camp were deplorable, we cannot conclude as a matter of law that the threat of duress or coercion was so *immediate* as to legally justify the accused's acts. Admittedly, lingering in the background at the camp was the threat of the caves. Moreover it appears that the accused was threatened with a 150–200 mile hike back north. At the time of this threat the accused was without shoes and he deduced that he would be unable to successfully accomplish the trip alive. However, assuming this fact to be true, the court-martial did not find that the threat, standing alone, fell within the immediacy contemplated by the law. Perhaps they felt that accused should have determined by refusal what would have then happened; whether and under what conditions the threat would have been carried out. He might have been given shoes. He might have been called upon to make the march in stages that he could have endured. We note that as a matter of fact many threats were made by the Communists which were not carried out. Major MacGhee testified that after several months' captivity, he definitely concluded that his captors would not carry out their threats to the death. He thereafter refused to "cooperate" and although sent to the caves, he survived. Also, the court-martial could have found that daily life in the prisoner camp did not equate to fear of immediate death or great bodily harm. During the accused's tenure as group leader, not a single prisoner of war died. Many people who resided in the caves died; many did not. Of the eight prisoners in Colonel Fleming's group

who eventually ended up in the caves, all survived. One, Lieutenant Crockett, died shortly after his release; however, he had long been seriously ill. At one time he had been hospitalized by his captors. The rigors of prison life eventually exacted their toll and this fine officer—like many others—died. Further, there is evidence in the record which indicates that the accused had already communicated and cooperated with his captors prior to his knowledge of the caves. He testified that he made his initial recording in Pyongyang and then moved to the new location near the caves. Before the move he had not been impressed with Kim's threats to put him into a "hole," and it was not until later that he was aware of the fact that the threat actually referred to the caves. But prior to that time he had made a recording allegedly stating that prisoners were being treated humanely and the United States had made a mistake in interfering in Korea. He had addressed the town meeting in Tackchon, purportedly declaring that the war was being fought at the behest of the Wall Street profiteers. He had also participated in some of the discussion groups. Finally, the fact-finders could have concluded that the prisoners were not—with isolated exceptions—physically abused. A number of witnesses testified that they were not subjected to physical abuse and that they had never noticed marks of physical violence upon the accused.

After a careful study of the facts in this case, we cannot conclude that the court-martial erred as a matter of law in not finding that the threats of duress and coercion fell within the law officer's definition of immediacy, which would excuse the accused's conduct. Stated differently, the court on the evidence of record could have reasonably found that the accused acted *without any* well-grounded apprehension of immediate death or serious bodily harm.

The accused next maintains that the evidence is insufficient in that his ability to adhere to the right was so *impaired or diminished* by harassment, deprivation, degradation, or physical impairment as to make it impossible for him to refuse his captor's demands or to adhere to the right with respect to the particular acts charged.

The expert psychiatric testimony adduced by both the prosecution and the defense was to the effect that although the accused was responsible for his acts and could adhere to the right, his ability with respect to the latter was *limited* or *impaired*. In this regard this Court has repeatedly approved the test set out in paragraph 120*b*, Manual for Courts-Martial, United States, 1951, which provides:

". . . A person is not mentally responsible in a criminal sense for an offense unless he was, at the time, so far free from mental defect, disease, or derangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right. The phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral, faculties. To constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement *but must also completely deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged.*" [Emphasis supplied.]

The law officer in his charge to the court gave this portion of paragraph 120*b* practically verbatim. There is simply no evidence of record that the accused's ability to distinguish right from wrong or adhere to the right was completely impaired. Evidence that the accused's ability to adhere to the right was *impaired* is not a good defense. Furthermore, under the facts of this case, the fact-finders were justified in finding that the accused could adhere to the right. The accused testified on two occasions he was so adamant in his stand that Colonel Kim threatened to kill him, and he told Kim to go ahead and pull the trigger. And after he left the Pyongyang area, according to his testimony, he no longer cooperated with

**557**

his captors and was considered a reactionary. These factors do not indicate even a partial inability to adhere to the right.

## II

*Did the law officer err by instructing the court that in order to excuse a criminal act on grounds of coercion, compulsion, or necessity, one must have acted under a well-grounded apprehension of immediate and impending death or of immediate serious bodily harm?*

That part of the law officer's instruction on duress and coercion, objected to by the accused, is set forth below:

"However, this doctrine of coercion, compulsion or necessity is hedged about with certain positive rules of law and is recognized only in clear cases. *In order to excuse a criminal act on the ground of coercion, compulsion, or necessity, one must have acted under a well-grounded apprehension of immediate and impending death or of immediate, serious, bodily harm.*

"Fear of injury to one's property or of remote bodily harm does not excuse a crime. Moreover, the threat of immediate and impending death or of serious and immediate bodily injury must have continued throughout the entire period of time during which the crime was allegedly committed. If the accused had a reasonable opportunity to avoid committing the crime without such danger, he cannot invoke duress as a defense. *In other words, this coercion or compulsion that will excuse a criminal act must be present, immediate and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done.*" [Emphasis supplied.]

During an out-of-court conference, the defense counsel, after objecting to the wording of the law officer's proposed instruction—as above given—offered a substitute:

". . . First of all, with reference to the instruction on coercion and compulsion, we object to the last sentence on page 21, which carries on to

page 22, in which the Law Officer proposes to instruct the Court as follows:

" 'In order to excuse a criminal act on the ground of coercion, compulsion or necessity, one must have acted under a well-grounded apprehension of immediate and impending death or of immediate, serious, bodily harm.'

"We submit that in lieu of the statement just read the following be incorporated in the instruction:

" 'Coercion, which will excuse the commission of an act, otherwise criminal, must be immediate and of such nature as to induce a well-grounded apprehension *of immediate, imminent, or impending death,* or serious bodily injury, and leave no reasonable opportunity to escape the compulsion without committing the act.'

"Now, in this connection it is our position that in light of the testimony in this case, notwithstanding the Manual instruction on the subject, it would be improper to instruct a jury that one must have acted under a well-grounded apprehension of immediate and impending death.

"The fear of mediate or a delayed, or a wasting death from starvation, deprivation or other like conditions, can just as well spell coercion and compulsion as the fear of immediate death.

"The instruction that we have requested is substantially taken from the case of R. I. Recreational Center vs Aetna Casualty & Surety Company, 172 [sic, 177] Fed. 2d, 603, and cited in 12 ALR 2d, at page 230, and in 14 CMR, at Page 350 [sic 356]." [Emphasis supplied.]

A similar instruction was before this Court in United States v Olson, 7 USCMA 460, 22 CMR 250. In that case Judge Latimer, writing for the Court, upheld the instruction as being in accordance with the Federal holdings.

In their brief, counsel for the accused admit that the law officer's instruction on duress and coercion is a correct statement of the law when prof-

fered as a defense to a routine crime committed in a civilized society. However, in a case such as this the defense argues that "to attempt to apply such law to the situation overwhelmingly shown by this record of trial, and by history to have existed in the prisoner of war camps, where every breath was drawn under constant pressure by unscrupulous captors, and in the ever present shadow of death, is to ignore reality to the grave prejudice of the accused." To buttress his position, the accused cites an 1865 opinion of The Judge Advocate General of the Army to the effect that the severe rule of duress, as laid down in Respublica v McCarty, 2 Dallas 86 (US 1781) (which held that the only excuse for joining the King's forces was the fear of immediate death), could not be properly applied in all its strictness to cases of Union prisoners—during the war between the States—who were held in Confederate prisons and allegedly subjected to "authenticated cruelties" and were thereby "induced" to join the Southern forces. This opinion, however, is not the law and merely expounds a policy pertinent to those times, that certain recaptured Union prisoners should not be court-martialed. On the other hand, we have ample Federal law on this precise subject which is as the law officer instructed.

In Iva Ikuko Toguri D'Aquino v United States, 192 F2d 338 (CA9th Cir) (1951) the defendant was convicted of treason, which arose from radio broadcasts from Japan (Tokyo Rose) during World War II. The defendant raised the defense of duress and coercion. The Court of Appeals held that:

". . . The Court instructed the jury at length upon the defense that the criminal act was not committed voluntarily but was the result of coercion, compulsion or necessity. The instruction included the statement that 'in order to excuse a criminal act on the ground of coercion, compulsion or necessity, one must have acted under the apprehension of *immediate and impending death or of serious and immediate bodily harm.* Fear of injury to one's property or

remote bodily harm do not excuse an offense.' It will be noted that the court's instruction was almost identical to that approved in Gillars v. United States, supra, 182 F. 2d at page 976, note 14. The charge was a correct statement of the law upon this subject. United States v. Vigol, 2 Dall 346, 2 U.S. 346, 1 L. Ed. 409; Respublica v. McCarty, 2 Dall 86, 2 U.S. 86, 1 L. Ed. 300; Shannon v. United States, 10 Cir., 76 F. 2d 490; R. I. Recreation Center v. Aetna Casualty & Surety Co., 1 Cir., 177 F. 2d 603, 12 A.L.R. 2d 230. [Emphasis supplied.]

"Appellant seriously contends that however correct the instruction might be in an ordinary case where a person accused of crime committed in his own country claims to have been coerced by an individual, the instruction of the court was in error particularly in its requirement of apprehension of *immediate* and impending death, or of *immediate* bodily harm, in a case where the accused person was in an enemy country, unable to get protection from the United States and where the compulsion is on the part of the enemy government itself.

". . . We know of no rule that would permit one who is under the protection of an enemy to claim immunity from prosecution for treason merely by setting up a claim of mental fear of possible future action on the part of the enemy. We think that the citizen owing allegiance to the United States must manifest a determination to resist commands and orders until such time as he is faced with the alternative of immediate injury or death. Were any other rule to be applied, traitors in the enemy country would by that fact alone be shielded from any requirement of resistance. The person claiming the defense of coercion and duress must be a person whose resistance has brought him to the last ditch."

In Gillars v United States, 182 F2d 962 (CA DC Cir) (1950), the defendant, Mildred Gillars, was convicted of treason for taking part in psychological warfare against the United States by

broadcasting radio programs from Germany during World War II (a German Tokyo Rose). The defense of duress and coercion was raised and the jury instructed as set forth in Footnote 14:

" 'Moreover, the force and fear, in order to constitute a defense in a case of treason, must continue during all the time of such service with the enemy, and one who makes force his defense must show that he left the service as soon as he could. In other words, ladies and gentlemen of the jury, this coercion or compulsion that will excuse a criminal act must be *present, immediate and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done.*

" '* * * *Nor is it sufficient that the defendant thought she might be sent to a concentration camp, if you so find, nor are threats to other persons sufficient. * * *' " [Emphasis supplied.]

The court concluded "The instructions which were granted were indeed all that the evidence warranted." We must necessarily note that both the civil and the military have repeatedly affirmed this same test over a period of many years. See Shannon v United States, 76 F2d 490 (CA10th Cir) (1935); United States v Floyd, 18 CMR 362; Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 297, 635; Snedeker, "Military Justice under the Uniform Code," § 2405(b)(1) (1953); Davis, "A Treatise on Military Law of the United States," 3d ed, page 138.

In the present case the board of review had this to say about the defense of coercion and duress (United States v Fleming [CM 377846], 19 CMR 438, 450):

"We are not unmindful of the hardships or the pressures to which the accused and his fellow prisoners were subjected prior to the time of his collaboration with the enemy. Obviously living conditions were not good, the diet was poor, and threats were made of worse things to come if cooperation was not forthcoming.

It could hardly be argued that the accused was not under great pressure. However, it is important to note that, at the times accused committed the acts alleged, the food ration, though scarcely abundant, was considerably improved over the ration in Camp Five. Furthermore, we cannot overlook the fact that accused cooperated with his captors upon the mere assertion of the threats. Thus, when first threatened with being forced to walk north to Pyoktong, the accused immediately proceeded to write and record his propaganda broadcast, without attempting to ascertain that his captors actually meant to carry out their threat. These circumstances preclude a finding that accused's fears were well grounded. But even assuming that accused was justified in believing that his captors would execute their threat, the defense of duress was not established, for the threat was not of immediate and impending death or serious bodily harm. It was not at all certain at the time the threat was made that walking north to Pyoktong would cause death at all, much less immediately. By way of comparison, if, for example, accused's captors had actually made him start on foot for Camp Five, and it then became evident that he could not survive the march, a valid defense of duress might have arisen for capitulation at that point. But that is not this case. Here the danger of death was problematical and remote. Even more damaging to the cause of the accused was the instance of the 'surrender appeal.' Accused 'voice-signed' this monstrous item of propaganda apparently upon the threat of having the food rations cut off or curtailed, and of being sent to the 'Caves'. The junior officers and enlisted men present refused en masse, although they were subject to substantially the same pressures as accused. Despite the example of capitulation set by the accused, a field grade officer and their leader, they at least were willing to determine whether their captors would send them to the Caves or cut off the food if they refused to collaborate.

Accused was not. As the court stated in *D'Aquino* v. *United States, supra,* 'The person claiming the defense of coercion and duress must be a person whose resistance has brought him to the last ditch' (182 F. 2d at 359). Accused's resistance had not 'brought him to the last ditch'; the danger of death or great bodily harm was not *immediate*. Accused can not now avail himself of the defense of duress."

The final disposition here as to duress and coercion must be determined by the law which is without exception that the defense is only available under a reasonably grounded fear of immediate death or great bodily harm. The fact-finders found such not to be the fact in this case.

### III

*Did the law officer err by refusing to give the defense requested instructions on insanity?*

The defense requested, during an out-of-court hearing, the following instruction as to the effect of physical impairment on the accused's ability to adhere to the right and resist his captors:

"In connection with your consideration of the elements of coercion and duress about which I have just instructed you, you are further instructed that you may take into consideration, in your deliberations, the elements of harassment, deprivation, degradation, and physical impairment, if any, as revealed by all of the evidence in this case. If, in your determination of the accused's ability to adhere to the right, you find, from the testimony that has been offered in this case, *that the ability of the accused so to do was so impaired or diminished by harassment, deprivation, degradation, or physical impairment, so as to make it impossible for the accused to refuse to comply with the demands of his captors or to adhere to the right, then, you must find him not guilty of those charges in which these elements are involved.*" [Emphasis supplied.]

We have already noted that the in-structions given by the law officer on duress and coercion were ▮▮▮▮▮ ▮ correct. The above re-quested instruction appears to be an effort to combine elements of the duress, coercion, and insanity defenses. We further observe that the law officer thereafter instructed the court concerning the approved test with respect to the ability to adhere to the right. Without ruling whether such an instruction as requested by the defense here would ever be required, suffice it to say that the defensive theories of duress and coercion were adequately covered by the law officer. The requested instruction would have changed the test of insanity as approved by this Court and set forth in paragraph 120*b* of the Manual for Courts-Martial, supra (and as given by the law officer) which declares that lack of mental responsibility must result from mental defect, disease, or derangement. Under the instruction as requested, the accused could have been acquitted by reason of mental irresponsibility even though he was not suffering from a disease of the mind. In addition, the requested instruction would have permitted acquittal of the accused by a showing that his ability to adhere to the right had only been *impaired* or *diminished* by *factors other than mental sickness* whereas the *law* as recognized by this Court requires *complete deprivation* of the ability to adhere to the right.

The only evidence of record touching upon mental capacity was the testimony of Drs. Arnold and Baker, psychiatrists, who testified that the accused was not suffering from mental defect, disease or derangement of the mind, but that his ability to adhere to the right was *possibly impaired* or *diminished* due to the stresses and strains of prison life and nutritional deficiencies. Defense witness, Dr. Baker, testified that the accused was not suffering from a psychiatric or psychoneurotic disorder. It is quite apparent, therefore, that the accused was not suffering from the type of physical infirmity recited by the Manual and approved by this Court.

One further facet of the accused's

argument as to insanity should be commented upon. The accused ██ attempts to bring himself within the rule of United States v Kunak, 5 USCMA 346, 17 CMR 346, and United States v Dunnahoe, 6 USCMA 745, 21 CMR 67, wherein it was held that partial mental irresponsibility arising from a mental impairment falling short of legal insanity was a defense to an offense requiring a specific criminal intent. The difficulty with this argument, however, is that the accused does not stand convicted of offenses requiring a specific criminal intent. The charges here are similar to the offense defined by Article of War 81, 10 USC § 1553 (1946 ed). The argument was raised in United States v Batchelor, supra, that Article 104 (the aiding the enemy Article of the Uniform Code of Military Justice which replaces Article of War 81) required a specific criminal intent. The Court held that the offense of knowingly communicating, corresponding, or holding intercourse with the enemy, in violation of Article 104, does not require a specific intent; that an instruction requiring only a finding of general criminal intent and a finding of words importing criminality is sufficient. We hold that the same reasoning should apply to the offenses now before this Court. See also paragraph 183d, Manual for Courts-Martial, supra, and paragraph 169c, Manual for Courts-Martial, U. S. Army, 1949.

Also throughout the lengthy record of this trial, it was never claimed by the accused or defense witnesses that he did not know he was communicating with the enemy. The accused testified at considerable length that he not only was aware that he was communicating with the enemy, but he resisted their efforts by delay, technicalities, and general sabotage. He recalled with vigor— and we believe him—that he never for an instant believed any of the "malarky" they were trying to get across to the prisoners. Absent is the claim that the accused was acting under any type of mental illness which deprived him of the ability to form a criminal intent.

## IV

*Did the law officer err by instructing*

562

*the court that the punishment for the offenses of which the accused was convicted included confinement at hard labor for life?*

According to the Manual for Courts-Martial, U. S. Army, 1949, the sentence for a conviction under the ██ Article of War 95 was dismissal, and for Article 96 as a court-martial might direct. Paragraph 117c of the 1949 Manual, supra, provides that:

". . . If an offense not listed in the table [Table of Maximum Punishments] is included in an offense which is listed and is also closely related to some other listed offense, the lesser punishment prescribed for either the included or closely related offense will prevail as the maximum limit of punishment."

So if no punishment is listed in the Table of Maximum Punishments with respect to an offense, we must examine the Table for a closely related offense. See United States v Stewart, 2 USCMA 321, 8 CMR 121; United States v Blevens, 5 USCMA 480, 8 CMR 104. The only similar offense to the instant one is Article of War 81 which provided that any person who, without proper authority, "knowingly . . . holds correspondence with or gives intelligence to the enemy, either directly or indirectly, shall suffer death or such other punishment as a court-martial or military commission may direct." However, the Table does not list a maximum punishment for that offense. We are therefore referred back to the Article itself. Thus it would appear that the law officer did not err by instructing the court that the maximum punishment was life imprisonment.

## V

*Did the law officer err by admitting into evidence Prosecution Exhibits 3, 5, 3a and 5a?*

The parties stipulated that Prosecution Exhibits 3 and 5 were magnetic tape recordings of radio broadcasts, purportedly emanating from the Central Broadcasting Station of the Democratic People's Republic of Korea located at Pyongyang, Korea. The broadcasts

were intercepted and recorded on the tapes on Okinawa by the United States Foreign Broadcast Information Service. Prior to their introduction into evidence, the records were played during an out-of-court hearing. Several witnesses identified their own and other voices and recognized segments of the recordings as containing appeals to the Five Great Powers, President Truman, and General MacArthur. Sergeant Mares identified the accused's voice and Warrant Officer Coxe believed that one of the voices was similar to the accused. Lieutenant Wilson testified that besides recognizing his own voice, he recognized the voices of the accused and other individuals who participated in the panel discussion. When the court reopened Wilson identified the panel discussion recording. It is quite true that the records were ■ garbled with extraneous noises and obviously the witnesses had difficulty recognizing clearly and distinctly the participants. However, since the source of the broadcasts was admitted and agreed upon by the parties, any difficulty in understanding portions of the broadcast would appear to affect only the weight to be assessed to the exhibits by the fact-finders, not their admissibility.

In United States v Schanerman, 150 F2d 941 (CA3d Cir) (1945), the accused was prosecuted for bribery of a draft board member to obtain a deferment. The court declared:

"No error is found, as charged by appellant, in the refusal of the district court to instruct the jurors to disregard what they had heard when records of conversations between Appellant and Finneran were 'played' in the hearing of the jury during the trial. This type of evidence was admissible upon the authority of Goldman v. United States, 316 U.S. 129, 62 S. Ct. 993, 86 L. Ed. 1322 . . . but the mere fact that certain portions of the mechanically recorded conversations were less audible than others did not call for exclusion of what the jurors personally heard from the 'playing' of the records. There would be no more valid reason for exclusion of the mechanically re-corded conversations than there would be for excluding competent conversations, overheard in part, by human witnesses."

Besides the garbled nature of the tapes, the accused argues that the broadcasts should also have ■ been excluded because the Communists may have through trickery altered the recordings after they had been made. This possibility would also affect weight rather than admissibility. If valid, certainly such an argument should in all instances comparable to this render recordings from enemy territory inadmissible. However, similar recordings were admitted in the Iva Ikuko Toguri D'Aquino and Gillars cases, supra.

One further complaint remains with respect to the recordings. After the president of the court expressed his dissatisfaction ■ about the lack of clarity of the tapes, an alleged expert in the field of radio and audiofrequency ran the recordings through an electric audio filter process and re-recorded them. This "expert" testified at the trial that since this filtering process removed only the high frequency noises it would not materially alter the sound characteristics of a male voice. The re-recordings were admitted into evidence as Exhibits 3a and 5a. The defense strenuously objected that since the original tapes were available, the best evidence rule precluded the admissibility of the secondary evidence. We agree with the holding of the court in People v Stephens, 117 Cal App2d 653, 256 P2d 1033 that re-recordings made from a tape and wire recording "would appear . . . admissible in evidence and that the best evidence rule is not applicable." In the present case the recordings were improved by the filtering process and the contents thereof were not changed. There is no logical reason why the benefits of scientific developments should be denied access to the courtroom so long as the rights of the accused are fully protected.

Moreover, in this case the accused never denied that he made recordings for his captors. His defensive posture

was that he committed the acts but under the unusual circumstances he was justified. On the witness stand, he admitted recording the round-table discussion and voice signing the appeals. Besides the accused, other witnesses testified to the content of the recordings. As we stated in the beginning of this opinion, the issue was not whether the accused did the acts, but whether the illegality thereof was more than offset by the accused's explanation—along with other evidence—justifying his conduct. We hold, therefore, that the accused was not prejudiced by the admission of these recordings into evidence.

## VI

*Was the accused prejudiced by the Government's use of a "shot gun" type of pleading?*

The accused stoutly contends that his rights were substantially prejudiced by frivolous pleadings on the part of the Government. He attempts to support his argument by quoting from a dissenting opinion of Judge Brosman in United States v Voorhees, 4 USCMA 509, 16 CMR 83, wherein the Judge condemned a "shot gun" type of pleading, which evinced an attempt to get a conviction despite the merits or lack of evidence as to all of the particular specifications and charges. The defense points the accusing finger at one of the specifications wherein it was alleged that during a crowded truck ride, the accused stomped on the foot of Corporal Gorr. The investigating officer recommended that the charge be dropped because, "I do not believe that the alleged offense committed under such circumstances was sufficiently serious as to warrant trial." Perhaps the advice of the investigating officer should have been heeded. But the convening authority has discretion in referring the charges. Under the circumstances we do not believe the accused was prejudiced or that the convening authority abused his discretion in referring this charge to trial. United States v Greenwalt, 6 USCMA 569, 20 CMR 285.

We are not unmindful of the rigors and horrors of the prisoner of war camps in Korea. Our sympathy goes out to the men who were unfortunately forced to endure the inhuman treatment foisted upon them by their barbaric captors. However, we cannot let a hard case make bad law. War is a harsh business and Colonel Fleming was a field grade officer in the United States Army. He was senior to most of the other prisoners of war in his group and acted as a group leader. The exigencies of the situation called upon him to be an example to his men. If anything, due to his superior rank and senior position, he was called upon to exercise a conduct more exemplary than the other prisoners. In this regard we think a quotation from the board of review holding in United States v Floyd [CM 374314], 18 CMR 362, is appropriate:

". . . As a commissioned officer of the United States Army, Colonel Keith, whether the senior American officer present in the particular camp or not, and although deprived of many of the functions and prerogatives of his office by his Communist captors, had the responsibility and duty to take such actions as were available to him (and if the senior officer present to exercise such command as he was able) to assist his fellow prisoners, to help maintain their morale, and to counsel, advise and, where necessary, order them to conduct themselves in keeping with the standards of conduct traditional to American servicemen."

The court-martial, convening authority, and the board of review found that he failed to meet those high standards demanded by the Army of an officer of his rank. Under the circumstances we cannot hold that they were wrong.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in the result):

I disagree with a number of statements made in the majority opinion. Most important is my disagreement with the major- ity's conclusion that, as a matter of law, a threat of confinement in the caves did not constitute a sufficient

threat of, at least, grievous bodily harm. The principal opinion itself notes that the "prisoners felt that a sentence to the caves was almost tantamount to a sentence of death"; that twenty-three Americans died in the caves between Major MacGhee's confinement and release; that the accused was taken to see fourteen newly captured prisoners confined in the caves, and by his last visit, all had died except one, and "he too was dying." In my opinion, this evidence is sufficient to raise a defense of coercion or necessity.

Raising a defense, however, does not mean that the court-martial was bound to accept it. Other evidence shows that the accused had freely and materially cooperated with and helped the enemy before he had heard or seen anything of the caves. Acts of misconduct prior to those charged can be considered by the court-martial in determining the accused's purpose or design in the commission of the offenses alleged. United States v Dickenson, 6 USCMA 438, 456, 462, 20 CMR 154. And, as the majority opinion indicates, there is evidence tending to show that the accused freely helped his enemy captors in enforcing their efforts to subjugate the prisoners. On the basis of this evidence, the court-martial could reject the accused's defense and find that he committed the acts charged without duress or compulsion. The question then is whether the court-martial received proper instructions from the law officer on the legal principles relating to the defense.

It is conceded, and the cases support the concession,[1] that the law officer's instructions are a correct general statement of the law. However, at the trial the accused contended that the court members should not be instructed that to establish his defense of coercion, it must appear that he "acted under a well-grounded apprehension of immediate and impending death," but that it would be sufficient if he were confronted with death, "or a wasting death from starvation, deprivation or other like conditions." As I have already noted, in my opinion, the evidence of the many deaths that occurred in the caves provides a basis from which the court members could find that a threat of confinement therein was sufficient for a "well-grounded apprehension" of immediate and impending death or serious bodily harm, especially since the threat bears the "color" of the conditions that existed there. See United States v Olson, 7 USCMA 460, 22 CMR 250. The requested instruction, however, does not present that issue. On the contrary, it attempts to substitute a general fear of future possible mistreatment for the requirement of a present threat of present harm. Accordingly, the law officer was justified in rejecting the request to instruct. Since the instructions which he gave are correct and appropriate, the accused cannot complain.

Further particularization of my disagreement with statements in the majority opinion is unnecessary. Suffice it to say that I agree with the conclusions on the points discussed. Consequently, I join in the result.

---

[1] Parenthetically, I do not read the 1865 JAG opinion cited by the majority as expressing merely a policy not to punish returned Union prisoners. It seems to me that the JAG opinion approaches the modern view that a threat of serious bodily harm as well as a threat of death gives rise to the defense of coercion or necessity. See United States v Olson, 7 USCMA 460, 22 CMR 250.